[No. A017222. First Dist., Div. Two. Dec. 13, 1982.]

ARCHIBALD A. McKIRDY, Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Kurt W. Melchior, Robert A. Spanner, Kenneth D. Noel and Severson, Werson, Berke & Melchior for Petitioner.

No appearance for Respondent.

George Deukmejian, Attorney General, Marjory Winston Parker, Assistant Attorney General, Rodney Davis and Susan J. Orton, Deputy Attorneys General, for Real Party in Interest.

OPINION

**SMITH, J.**—The Attorney General's Medi-Cal Fraud Unit obtained from the San Francisco Municipal Court a search warrant for the office and home of Archibald A. McKirdy, M.D., a psychiatrist. Upon execution of the warrant at McKirdy's office Fraud Unit investigators seized 49 files labelled with the names of patients together with other materials. McKirdy promptly filed in the municipal court a "notice of petition to quash search warrant and for return of property." The municipal court granted McKirdy's petition. The Attorney General petitioned respondent superior court for a writ of mandate or prohibition. The superior court issued a peremptory writ of prohibition vacating the municipal court's order and thus, in practical effect, validating the search. McKirdy then petitioned this court for a writ of mandate or prohibition to vacate the superior court's order. We initially denied the petition. The Supreme Court granted a hearing and retransferred the cause to us with directions to issue the alternative writ. We have done so. Upon consideration of the written and oral arguments of the parties we conclude that the superior court's ruling was correct and that the municipal court should not have granted McKirdy's petition to quash the warrant. Accordingly, we deny the peremptory writ and discharge the alternative writ.

At relevant times, McKirdy was a licensed physician and an enrolled provider of publicly funded health services under California's Medi-Cal statute (Welf. & Inst. Code, § 14000 et seq.). To obtain payment for services rendered to patients entitled to Medi-Cal benefits McKirdy was required to submit claims on specified forms accompanied by specified documentation, and itemizing services rendered. Itemization was to be accomplished by means of codes assigned to enumerated categories of psychotherapeutic treatment: 45-50 minute individual sessions, 25 minute individual sessions, 15 minute individual sessions, 90 minute group sessions, and an initial comprehensive history and examination. Per patient the highest payable Medi-Cal rate was for initial examination and the next highest was for 45-50 minute individual sessions. The rate payable for each individual patient in a group session was less than half the rate for a 45-50 minute individual session.

The search warrant was issued on the basis of a 30-page affidavit signed by Fraud Unit Investigator Beall. The affidavit recites that to detect and prevent fraudulent claims the Medi-Cal program incorporated auditing procedures to identify providers who have billed Medi-Cal for more than 10 hours of health services in any single day. In 1981 the Fraud Unit concluded on the basis of these auditing procedures that in 1979 and 1980 McKirdy "had on numerous occasions billed the Medi-Cal Program for 10 to 15 45-50 minute patient sessions per day." According to the affidavit, follow-up investigation disclosed that McKirdy had received $76,392.31 in paid Medi-Cal claims during 1980 and that McKirdy had recently been subject to Board of Medical Quality Assurance proceedings in which he had been found to have prescribed drugs unnecessarily. The affidavit reflects that Beall identified the patients for whom McKirdy had submitted Medi-Cal claims and interviewed several of them. As described in the affidavit, the interviews supported inferences that McKirdy had on several occasions submitted claims for 45-50 minute sessions when the services rendered should instead have been itemized as shorter individual sessions or as group sessions compensable at lower rates. Beall concluded that McKirdy had billed Medi-Cal for services he had not performed. The search warrant was sought and issued to authorize seizure of additional evidence, including "[a]ll medical records that disclose the type and extent of services [McKirdy] billed the Medi-Cal Program for providing between January 15, 1979 and April 27, 1981," relevant to the possibility that McKirdy had defrauded Medi-Cal. A list of patients for whom McKirdy had submitted Medi-Cal claims was attached to the warrant and incorporated in the affidavit.

Unquestionably McKirdy was a psychotherapist within the meaning of subdivision (c) of Penal Code section 1524, which provides in pertinent part that "no search warrant shall issue for any documentary evidence in the possession or under the control of any person, who is . . . a psychotherapist as defined in section 1010 of the Evidence Code . . . and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested" unless a special master is appointed to conduct the search and to take possession of any documents seized until a superior court hearing on search, seizure, and privilege issues can be held.[1] No special master was appointed in this action.

---

[1]The special master procedure is described as follows in Penal Code section 1524: "(c) . . . (1) At the time of the issuance of such warrant the court shall appoint a special master in accordance with subdivision (d) to accompany the person or persons who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for such items in the areas indicated in the search warrant.

"(2) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing.

"At such hearing the party searched shall be entitled to raise any issues which may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided

I. *The special master procedure*

In the municipal court McKirdy challenged the search on several grounds. The municipal court concluded that although the search warrant procedure had been proper in all other challenged respects, the warrant should be quashed for failure to comply with the special master procedure. The superior court vacated the municipal court's order on the sole stated ground that the special master procedure was inapplicable. ■ Since McKirdy was a psychotherapist and the documents to be seized were in his possession, the narrow question initially presented to us is whether the exception for a document custodian reasonably suspected of relevant criminal activity could properly have been invoked in the circumstances of record. If (as McKirdy strenuously contends) the exception could not be invoked, then patently the special master procedure applied and should have been followed and we should issue the writ. We conclude, contrary to McKirdy's contentions, that the exception is valid and that McKirdy came within it.

by law. Any such hearing shall be held in the superior court. The court shall provide sufficient time for the parties to obtain counsel and make any motions or present any evidence. Such hearing shall be held within three days of the service of the warrant unless the court makes a finding that such expedited hearing is impracticable. In that case the matter shall be heard at the earliest possible time.

"(3) Any such warrant must, whenever practicable, be served during normal business hours. In addition, any such warrant must be served upon a party who appears to have possession or control of the items sought. If after reasonable efforts, the party serving the warrant is unable to locate any such person, the special master shall seal and return to the court for determination by the court any item or items which appear to be privileged as provided by law.

"(d) As used in this section, a 'special master' is an attorney who is a member in good standing of the California State Bar and who has been selected from a list of such attorneys which is maintained by the State Bar particularly for the purposes of conducting the searches described in this section. Such attorneys shall serve without compensation. A special master shall be considered a public employee, and the governmental entity which caused the search warrant to be issued shall be considered the employer of the special master and the applicable public entity, for purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code, relating to claims and actions against public entities and public employees. In selecting the special master the court shall make every reasonable effort to insure that the person selected has no relationship with any of the parties involved in the pending matter. Any information obtained by the special master shall be confidential and shall not be divulged except in direct response to inquiry by the court.

"In any case in which the magistrate determines that, after reasonable efforts have been made to obtain a special master, a special master is not available and would not be available within a reasonable period of time, the magistrate may direct the party seeking the order to conduct the search in the manner described in this section in lieu of the special master.

"(e) Any search conducted pursuant to this section by a special master may be conducted in such a manner as to permit the party serving the warrant or his designee to accompany the special master as he conducts his search. However, such party or his designee shall not participate in the search nor shall he examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served.

"(f) As used in this section 'documentary evidence' includes, but is not limited to, writings, documents, blueprints, drawings, photographs, computer printouts, microfilms, X-rays, files, diagrams, ledgers, books, tapes, audio and video recordings, films or papers of any type or description."

McKirdy argues briefly that the Fraud Unit did not sufficiently show that its suspicion that McKirdy had engaged in relevant criminal activity was factually reasonable. Specifically, McKirdy asserts that Beall's interviews with less than all of the patients whose files were ultimately seized establishes neither that McKirdy might have been engaged in criminal activity related to the files of patients who had not been interviewed nor that the suspected criminal activity related to all of the documents in the files of patients who had been interviewed. We reject this argument. McKirdy himself has placed before us a copy of Beall's 76-page report of investigation which provides ample factual justification for the Fraud Unit's suspicion that McKirdy had been engaged in pervasive Medi-Cal fraud.

McKirdy's more thoroughly developed contention is that we must invalidate, or at least disregard, the statutory exception because it is unconstitutional. It is his position that the exception is in fatal conflict with his patients' inalienable constitutional right of privacy. (Cal. Const., art. I, § 1; cf. *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14 L.Ed.2d 510, 514-515, 85 S.Ct. 1678], and cognate cases under the federal Constitution.)

We have recognized a nexus between the confidentiality of information derived from psychotherapist-patient communications and the constitutional right of privacy. (*Smith* v. *Superior Court* (1981) 118 Cal.App.3d 136, 140 [173 Cal.Rptr. 145]; cf. also *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]; *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 676-679 [156 Cal.Rptr. 55] [physician-patient privilege].) ▇ While the right of privacy is not absolute, it is well established that the propriety of any governmental intrusion upon the right will depend upon a showing that the intrusion was justified by a state need which was compelling not only in the abstract but also when weighed against the privacy rights of the individual and that the scope of the intrusion was no greater than could be justified by the state's need in all the circumstances. (Cf. *White* v. *Davis* (1975) 13 Cal.3d 757, 775 [120 Cal.Rptr. 94, 533 P.2d 222]; *Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516, 524-526 [174 Cal.Rptr. 160]; *Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d at p. 680. ▇ McKirdy argues that the special master provisions of Penal Code section 1524 are a legislative response to this constitutional mandate, providing in circumstances to which section 1524 applies a procedure by which documents which may contain confidential communications will not be disclosed (to anyone other than the special master) until after a hearing at which interests can be weighed and alternatives explored. (Cf. *Deukmejian* v. *Superior Court* (1980) 103 Cal.App.3d 253, 258 [162 Cal.Rptr. 857].) It seems clear that the patient's constitutional right of privacy is wholly independent of any criminality which might be attributed to the psychotherapist; from this premise McKirdy argues that the purported

statutory exception for instances in which the psychotherapist is suspected of criminality , "would preclude the balancing of interests required under the California Constitution" and accordingly is inconsistent with the privacy clause. Citing *Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497, 506-507 [134 Cal.Rptr. 668, 556 P.2d 1119], McKirdy suggests that the asserted constitutional defect " 'may be cured simply by excising' " the statutory exception, that this is in effect what the municipal court did, and that therefore the municipal court's order was correct and should not have been vacated by respondent superior court.

■ "The state Constitution is controlling and statutes which are inconsistent with and contrary to constitutional provisions cannot stand. [Citations.] Every intendment, however, is in favor of the validity of a statute, and it should not be held to be void unless it is clearly repugnant to the Constitution. [Citation.] If reasonably possible, a harmonious adjustment of the constitutional provision and the statutory provision will be found. [Citation.]" (*Wright* v. *Compton Unified Sch. Dist.* (1975) 46 Cal.App.3d 177, 183-184 [120 Cal.Rptr. 115]; cf., e.g., *Department of Corrections* v. *Workers' Comp. Appeals Bd.* (1979) 23 Cal.3d 197, 207 [152 Cal.Rptr. 345, 589 P.2d 853]; *English* v. *Marin Mun. Water Dist.* (1977) 66 Cal.App.3d 725, 730 [136 Cal.Rptr. 224].) ■ McKirdy's contention fails for want of a demonstrable conflict between the statutory exception to the special master procedure and the privacy clause of the California Constitution. The privacy clause is manifestly self-executing (cf. *White* v. *Davis, supra,* 13 Cal.3d 757, 775) and requires no statutory implementation. Under the privacy clause one who seeks, in behalf of the state or by invocation of state authority by judicial process or otherwise, to obtain information subject to individual privacy rights must be prepared to make a showing of predominant state need and sufficiently circumscribed means. It is absurd to suggest, as McKirdy necessarily does, that the special master procedure is the only sufficient vehicle for such a showing in this action and therefore that the statutory exception would—or could—"preclude" such a showing. If the privacy clause applies at all to the situation described in the record it applies notwithstanding the statutory exception.

## II. *The constitutional right of privacy*

■ Our analysis leads directly to the question whether in this action, without reference to the special master procedure and without reaching search and seizure issues, the procedure the Fraud Unit followed violated the constitutional privacy rights of McKirdy's patients as expressly stated in article I, section 1 of the California Constitution and as found implicit in the federal Bill of Rights. We conclude that there was no violation.

Preliminarily we consider the question whether the Fraud Unit's failure to obtain, in advance, a hearing on the privacy issues upon notice to all parties itself violated the patients' privacy rights. The undeniable significance of the concept of personal privacy lends philosophical appeal to a rule requiring such a hearing in every case in which information is to be obtained by state action in arguable derogation of an individual's privacy rights. However, such a rule's breadth and inflexibility would in many applications create practical problems disproportionate to its abstract desirability. The scope of the privacy clause is potentially enormous and the variety of circumstances in which it might be invoked is essentially infinite. To require a noticed preliminary judicial determination whenever privacy rights are arguably involved would severely, and in our view unnecessarily, restrict the state's capacity to conduct legitimate inquiries. Administration of the privacy clause, like the right of privacy itself, should take adequate account of all competing interests in the circumstances of each case.

In general, the state, or a private proponent who invokes the state's authority by judicial process or otherwise, should (whenever individual privacy rights can reasonably be perceived to be involved) make a showing of predominate state need and sufficiently circumscribed means, in a form susceptible to judicial review, before disclosure is compelled whenever reasonably possible and as soon as reasonably possible in any event. The proponent should also obtain an advance judicial determination of the propriety of the inquiry whenever it is reasonable and practical to do so. The proponent should notify the individual of the proposed or accomplished incursion upon his privacy rights whenever and as soon as reasonably and practically possible. The determination of what is reasonable and practical should be gauged by the circumstances of each case as it arises and should take into account not only the interests of the parties but also the availability and sufficiency of existing procedures.

Thus, in civil litigation the Discovery Act already provides means by which notice must be given, and privacy issues may be fully litigated, before court process to compel discovery will issue. (Code Civ. Proc., § 2016 et seq.; cf. *In re Lifschutz, supra,* 2 Cal.3d 415; *Smith* v. *Superior Court, supra,* 118 Cal.App.3d 136.) In proceedings in which a state administrative agency is empowered to issue its own subpoenas it is enough that the state incorporate into the subpoena declaration a showing on the privacy issues sufficient to sustain the state's position upon subsequent judicial review. (*Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d 669, 680-681.)

In areas of criminal and disciplinary investigation, it has not been the rule that a noticed hearing must be had before disclosure is compelled. The reason seems plain: the state's legitimate interest in obtaining full and accurate information would be unduly compromised, in such situations, by affording direct or in-

direct advance notice to an inculpated custodian who might be motivated to destroy, conceal, or alter the evidence. These considerations, we take it, led the Legislature to make the exception to the special master procedure which we have found to be applicable to McKirdy in this action. (Pen. Code, § 1524, subd. (c).) In such circumstances the search warrant procedure, designed for the very purpose of permitting neutral and detached, albeit ex parte, determination of the propriety of a proposed invasion of a reasonable expectation of privacy, provides a satisfactory means by which the state's showing may be made and determined in circumstances such as these.

Here, the magistrate's decision to issue the warrant sufficiently implies a determination that the privacy rights of McKirdy's patients should give way to the limited extent necessary to permit execution of the search warrant. Beall's affidavit provides an adequate basis for that determination.

In light of the well-documented high incidence of fraud upon publicly funded health care programs at the expense of the public (cf., e.g., 1977 U.S. Code Cong. & Admin. News, No. 3, at pp. 3040-3050), a legitimate state need to obtain evidence of such fraud is manifest. The specific state need to obtain access to patient records in this action is similarly manifest from Beall's affidavit. Such records could rationally be supposed to contain contemporaneous records of the services McKirdy actually performed for each of his Medi-Cal patients to supplement, verify, and in some instances render coherent, the statements Beall had obtained from some of the patients. The records also offered an efficient source of leads for further interviews with other patients and a basis upon which to construct questions to be put to such patients.

To evaluate the balance between this need and the countervailing interest of McKirdy's patients in the privacy of their records it is necessary to analyze the privacy clause itself. The privacy clause was added to the California Constitution by initiative. From a statement in the election brochure the Supreme Court has deduced its purpose and limits: "First, the statement identifies the principal 'mischiefs' at which the amendment is directed: (1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records. Second, the statement makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling interest. Third, the statement indicates that the amendment is intended to be self-executing, i.e., that the constitutional provision, in itself, 'creates a legal and enforceable right of privacy for every Californian.'" (*White* v. *Davis, supra,* 13 Cal.3d 757, 775.) The

Fraud Unit investigation described in the record does not, in our view, fall into any of the categories of governmental "mischief" identified by the Supreme Court. Beall's focused and methodical investigation and the search warrant procedure itself do not evoke the aimless connotation of "snooping" and were no more secret than practicality requires of any criminal investigation. In light of the information available to the Fraud Unit at the time the search was conducted, the seizures cannot be said to have been overbroad and there is no evidence that the Fraud Unit intends to retain any information not directly relevant to the criminal investigation. There is no showing of any improper use of the information and it appears that the Fraud Unit has made substantial efforts to check and to recheck the accuracy of all of the information it has received. It has been judicially suggested that an intradepartmental communication of information concerning a welfare recipient, intended to prompt a welfare fraud investigation, "is not the stuff out of which a cause of action for violation of right of privacy grows." (*Haskins* v. *San Diego County Dept. of Public Welfare* (1980) 100 Cal.App.3d 961, 971 [161 Cal.Rptr. 385].) This view is consistent with election-brochure statements, in support of the privacy clause initiative and in response to expressed concerns that the clause would restrict welfare fraud investigations, to the effect that the clause would limit only misuse of confidential information and would not hamper legitimate government activity. Any psychotherapy patient has a wholly proper and substantial interest in the privacy of his or her communications with the psychotherapist. However, we conclude that the patients' privacy interests are plainly outweighed, in the circumstances before us, by the state's need to investigate and to prosecute a suspected fraud of which the patients themselves, as members of the public and as short-changed recipients of health care services, would be victims.

Finally, we believe that the terms of the search warrant as issued, in light of the availability of the very protective procedures of which McKirdy has availed himself, represent within practical bounds sufficient limitations upon the state's inquiry. To us the key is practicality. McKirdy argues for stricter limits and more elaborate procedures, while undoubtedly the Fraud Unit would have preferred carte blanche to seize and, at leisure, to screen all of McKirdy's records. At the time the warrant issued neither the Fraud Unit nor the magistrate had means of knowing what McKirdy's patient records would contain. The warrant might properly have incorporated provision, in light of the apparent privacy interests of the patients, for early screening and for prompt return of matter not clearly relevant to the criminal investigation, perhaps subject to review at a hearing to be noticed once the search was complete. However, we conclude that omission of such unprecedented safeguards from this warrant is not fatal to its validity under the privacy clause. We anticipate that the state's representatives will take all appropriate steps to assure that no more disclosure will be made of confidential patient information than is clearly necessary to meet the legitimate state need described above.

### III. *Other issues*

In both lower courts McKirdy tendered several additional grounds on which, he contended, the warrant should have been quashed. He renews these contentions in this court. It might have been argued that these contentions were never reached in the superior court proceedings which are before us for review but the Attorney General does not make the argument. Instead the Attorney General responds to each of McKirdy's contentions on the merits. Both because it could rationally be inferred that the superior court did consider and reject each such contention and because we deem it conducive to judicial efficiency, we briefly discuss each of McKirdy's additional contentions.

### 1) *The affidavit: probable cause*

McKirdy argues that "[t]he State's affidavit, based on stale and uncorroborated information from five clearly unreliable informants, failed to support the Magistrate's finding of probable cause to seize all Medi-Cal patient files."

■ The basic rules of review are clear: "[I]t is well settled that ' "[t]he warrant can be upset only if the affidavit fails *as a matter of law* to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit. . . .' " (Italics in original.) [Citations.] In examining the affidavit for sufficiency of the facts therein to support the magistrate's finding of probable cause, it is axiomatic that the courts are to interpret the affidavit in a common sense, nontechnical manner. [Citations.] The reviewing court will pay substantial deference to the magistrate's determination of probable cause [citation] and may sustain a search where one without a warrant would fail [citation]." (*People* v. *Emanuel* (1978) 87 Cal.App.3d 205, 212-213 [151 Cal.Rptr. 44].)

We conclude that the affidavit was sufficient.

### (a) *Reliability and corroboration*

■ Beall's affidavit describes interviews with eight of McKirdy's Medi-Cal patients. Each of the patients interviewed described consultations with McKirdy which were substantially shorter than or different in nature from the 45-50 minute individual sessions for which McKirdy (according to other facts recited in the affidavit) subsequently billed.

As presented to the magistrate by Beall's affidavit, the statements of these patients were the equivalent of hearsay and, accordingly, subject to the rule that the affidavit must (among other things) "contain some underlying factual infor-

mation from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable. [Citations.]" (People v. Hamilton (1969) 71 Cal.2d 176, 180 [77 Cal.Rptr. 785, 454 P.2d 681]; cf. Aguilar v. Texas (1964) 378 U.S. 108, 114 [12 L.Ed.2d 723, 728-729, 84 S.Ct. 1509]; People v. Smith (1976) 17 Cal.3d 845, 850 [132 Cal.Rptr. 397, 553 P.2d 557].) The rule thus stated is disjunctive. The affidavit will be sufficient if it contains facts to support a conclusion either that the informant was credible or that the statement was reliable. McKirdy necessarily argues that neither of these alternative requirements was met. The Attorney General argues that the patients' statements were reliable because they were sufficiently independently corroborated.

We agree with the Attorney General. Both in specific detail and in general tenor the statements attributed to each patient were adequately corroborated not only by other facts developed by Beall's investigation—for example: the initial revelation that McKirdy had often billed for 10 to 15 45-50 minute sessions in a single day; a reported Medi-Cal income level for 1980 which, at the highest rate reportedly applicable to 45-50 minute Medi-Cal therapy sessions, would have required McKirdy to have conducted between seven and eight such sessions every weekday of the year without allowance for holidays or vacations; claim records which correlated with the dates, if not the details, of the sessions described by the patients—but also by the consistency in description of McKirdy's pattern of behavior among all of the patients' statements (cf. People v. McFadin (1982) 127 Cal.App.3d 751, 767 [180 Cal.Rptr. 4]; People v. Amos (1977) 70 Cal.App.3d 562, 567 [139 Cal.Rptr. 30]; People v. Balassy (1973) 30 Cal.App.3d 614, 621 [106 Cal.Rptr. 461]).

(b) Staleness

██ Some of the patient statements summarized in Beall's affidavit related to events three to four years old at the time the statements were given. McKirdy argues that this and other information in the affidavit are fatally stale.

The argument evokes the established principles that "[a]s a general rule, information is stale, and hence unworthy of weight in the magistrate's consideration of an affidavit, unless the information consists of 'facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.' [Citations.] No clear cut rule, of course, tells us when the time span must be deemed too attenuated. 'The length of the time lapse alone is not controlling since even a brief delay may preclude an inference of probable cause in some circumstances while in others a relatively long delay may not do so. Nonetheless, there are obviously some limits.' [Citation.]" (Alexander v. Superior Court (1973) 9 Cal.3d 387, 393 [107 Cal.Rptr. 483, 508 P.2d 1131].) Under these general principles it would appear that the age of the information

furnished would not necessarily bear on the sufficiency of probable cause inasmuch as what the Fraud Unit sought was not evanescent contraband but rather business and professional records which presumably would be retained unaltered for periods of several years.

Apparently these general principles are not exactly that to which McKirdy is referring. McKirdy expresses the specific concern that the patients' statements would be rendered unreliable by a passage of time. So phrased his argument simply recasts a contention we have already discussed. We conclude that the time intervals reflected in the affidavit do not vitiate it.

(c) *General sufficiency*

■ Finally McKirdy argues that the affidavit does not establish probable cause to seize all of the patient records ultimately taken. Relying on language in *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 250-251 [118 Cal.Rptr. 166, 529 P.2d 590], he argues that "the warrant at issue authorized a search of *all* of Dr. McKirdy's Medi-Cal patient files. Such a warrant, not limited to the particular patient files for which probable cause was shown, cannot stand . . . ." (Italics in original.)

This argument requires a return to general principles: "[T]he more appropriate standard of probable cause is whether the affidavit states facts that make it substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought. [Citations.]" (*People* v. *Cook* (1978) 22 Cal.3d 67, 84, fn. 6 [148 Cal.Rptr. 605, 583 P.2d 130].) In our view the affidavit sufficiently establishes a probability that information directly relevant to the criminal investigation would be found in business and professional records then located in McKirdy's office or home. The zone of direct relevance is sufficiently circumscribed by the affidavit's references to records concerning Medi-Cal claims in a specified period. Whether all records within the circumscription were "lawfully subject to seizure" is a matter to be resolved not by search and seizure principles but rather by consideration of the patients' privacy interests. We have already concluded that the affidavit was sufficient to support the magistrate's implicit finding that the state's need outweighed the patients' individual interests in these circumstances. *Burrows* v. *Superior Court, supra,* 13 Cal.3d 238, is factually distinguishable. In *Burrows* the warrant was issued on the basis of testimony which described only the suspect's alleged peculations from a single victim and for that reason, among others, was held insufficient to authorize searches of the suspect's records relevant to other individuals. Here, the affidavit sufficiently demonstrates the probability of fraudulent conduct involving many, if not all, of McKirdy's Medi-Cal patients.

2) *The warrant: particularity*

 McKirdy also attacks the search warrant itself, contending that it was "irremediably overbroad" both because it lacked sufficient particularity and because it authorized seizure of records of patients other than those as to whom specific facts had been developed in the affidavit. The second point, for which McKirdy again relies on *Burrows* v. *Superior Court, supra,* 13 Cal.3d 238, is essentially a reiteration of his contention, discussed above, that the affidavit did not establish probable cause as to all of the records seized. McKirdy's remaining contention is that the warrant lacked particularity sufficient to "place a meaningful restriction" on the objects to be seized. (*People* v. *Superior Court (Williams)* (1978) 77 Cal.App.3d 69, 76 [143 Cal.Rptr. 382], disapproved as to distinct issue in *People* v. *Superior Court (Meyers)* (1979) 25 Cal.3d 67, 77, fn. 9 [157 Cal.Rptr. 716, 598 P.2d 877].)

The warrant describes the property to be seized in five numbered categories, covering appointment records, medical records, official publications, Medi-Cal procedural materials, and Medi-Cal billing records. McKirdy focuses on the medical records category which the warrant describes as follows:

"(2) All medical records that disclose the type and extent of services Arthur McKirdy, M.D., billed the Medi-Cal Program for providing between January 15, 1979 and April 27, 1981. Each of these services is listed in Exhibit 1 [records of McKirdy's Medi-Cal claims for the period] by the patient's name, the patient's Medi-Cal identification number, the date the service was provided, the diagnostic code, the type of service provided, the numbered claim form the claim was presented to the Medi-Cal program on, the amount billed, and the numbered check used to pay for each service billed."

"Whether the description in the warrant is sufficiently definite is a question of law on which an appellate court makes an independent judgment. [Citation.]" (*People* v. *Superior Court (Williams), supra,* 77 Cal.App.3d at pp. 76-77, listing many of the earlier appellate decisions.) Citing federal cases, McKirdy argues that the quoted description violates constitutional limitations because it permits indiscriminate seizure. Apparently to lend evidentiary support to his contention, he asserts that the executing officers did, in fact, engage in an indiscriminate exploratory search. We postpone consideration of the point because McKirdy's challenge to the warrant itself must be determined on the face of the warrant rather than in light of subsequent events. On its face the quoted description is, in our view, sufficiently particular to satisfy constitutional requirements. While we would, of course, accord respectful attention to pertinent federal appellate decisions, we conclude that neither *Application of Lafayette Academy, Inc.* (1st Cir. 1979) 610 F.2d 1, 6, nor *United States* v. *Abrams* (1st Cir. 1980) 615 F.2d 541, 542-543, on which McKirdy relies,

would, upon its specific facts, be controlling in this action in any event. The warrant description in *Burrows* is manifestly far broader than the description McKirdy attacks.

3) *Execution of the warrant: exploratory search*

█ McKirdy next contends that by seizing entire files when the warrant authorized only seizure of particular records the Fraud Unit demonstrated that it in fact engaged in a general exploratory search of McKirdy's office. Therefore, McKirdy argues, all evidence seized must be returned. Again McKirdy relies on *Burrows*. However, in relevant part *Burrows* turned not on the scope of the search but rather on the facial sufficiency of the warrant. (*Burrows* v. *Superior Court, supra*, 13 Cal.3d at pp. 248-251.) It is clear that law enforcement officers may not use a search warrant directed to specifically described premises and property simply as a predicate for a general and indiscriminate search of the premises, but we disagree with McKirdy's contention that that is what occurred in this action. The record furnished to us with respect to execution of the warrant is sketchy. We conclude that the executing officers have not been shown to have acted unreasonably. Any materials which may be shown, in further proceedings, to have been beyond the scope of the warrant should of course be returned absent an independent, constitutionally sufficient basis for their retention. We find in the record before us no justification for an order to return all evidence seized.

4) *"Misconduct"*

█ Finally, McKirdy complains of what he characterizes as state "misconduct" and "impropriety" in the preparation of the search warrant affidavit. The Attorney General concedes that the previous Board of Medical Quality Assurance licensing action against McKirdy had been resolved by a stipulation in which McKirdy acknowledged misconduct and the parties agreed that all admissions of fact and conclusions of law were made exclusively for the administrative proceeding "and shall not be deemed to be admissions for any purpose in any other administrative, civil or criminal action . . . ." In his affidavit Beall recited that representatives of the board had informed him that there had been an investigation of allegations that McKirdy had unnecessarily prescribed drugs, that an administrative complaint had been filed, that an adjudication had been reached in which the allegations against McKirdy had been found to be true and that McKirdy had been suspended from practice for 30 days. McKirdy contends that this recitation breached the terms of the earlier stipulation and invalidates the warrant. The Attorney General responds that Beall did not breach the stipulation but "simply noted the historical facts of the existence, substance, and disposition of the licensing actions all of which were matters of public record."

While in our view the Attorney General is walking a fine line, the recitation was peripheral to the substance of the affidavit and we do not regard the point as dispositive.

Because we conclude that the search warrant should not have been quashed, we find it unnecessary at this stage to consider whether or to what extent "the Victim's Bill of Rights" (adopted by our electorate as Proposition 8 on the June 1982 ballot) would be applicable to the facts before us.

The peremptory writ is denied. The alternative writ is discharged.

Rouse, Acting P. J., and Miller, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied February 16, 1983. Grodin, J., did not participate therein.