In re GRAND JURY INVESTIGATION.

Nos. 80–573–Appeal, 80–574–Appeal.

Supreme Court of Rhode Island.

Feb. 9, 1982.

Dennis J. Roberts, II, Atty. Gen., Joel D. Landry, Joseph P. Ippolito, Jr., Special Asst. Attys. Gen., for appellant.

Corcoran, Peckham & Hayes, Kathleen Managhan, Scott Umsted, Jr., Newport, for appellees.

## OPINION

SHEA, Justice.

This appeal presents for our review one aspect of the newly created patient-physi-

cian privilege contained in the Confidentiality of Health Care Information Act, G.L. 1956 (1976 Reenactment) § 5–37.3–1 through § 5–37.3–10, as enacted by P.L. 1978, ch. 297, § 1. The issue before us is whether or not the act can prevent the subpoenaing of a physician's records of patient treatment during an investigation of alleged Medicaid fraud in which applicable federal law requires disclosure.

At a hearing held in the Superior Court the trial justice quashed two subpoenas duces tecum issued by a grand jury seeking to obtain the medical records of certain named patients of two private physicians. The trial justice ruled that the patients' records were privileged under the Rhode Island statute and ordered the subpoenas quashed. The state appealed the order. We hold that under the supremacy clause of the United States Constitution, Article VI, federal law prevails and that the medical records in the possession of the physicians are obtainable by the grand jury in this situation.

Doctors Philip C. McAllister and Philip O. Baumgartner are physicians practicing in Newport, Rhode Island. On June 24, 1980 each was served with a subpoena duces tecum ordering his appearance before the Newport County Grand Jury on June 30, 1980, with the requested medical files. On June 30, the trial justice sitting in Newport granted their motion to quash the subpoenas on the basis of the provisions of the Confidentiality of Health Care Information Act. The justice ruled also, however, that the subpoenas could be redrafted to indicate any authority for disclosure of the records and that a redrafted subpoena would have to describe the records sought with greater specificity. Redrafted subpoenas were issued on July 1, 1980 ordering their appearance on July 3. Doctors McAllister and Baumgartner did not move to quash these new subpoenas by that date nor did they appear as ordered. The Medicaid Fraud Unit of the Department of the Attorney General then moved for a hearing at which time the physicians would be required to show cause why they should not be held in contempt for their failure to appear as ordered. A hearing was held before a second

justice of the Superior Court on July 10, 1980. The subpoenas were again quashed, and the justice held that the doctors should not be held in contempt. He ruled that because of the Rhode Island confidentiality statute the only material obtainable from the medical records would be the time and place at which the individual patient received treatment. These second subpoenas had asked for the complete medical file from July 1, 1977, to the present of each of twenty-six named individuals. Consequently he found that these newly issued subpoenas were overly broad.

Subsequently, on August 1, 1980, the Newport County Grand Jury indicted Dr. Baumgartner on thirteen counts of violating G.L.1956 (1968 Reenactment) § 21–28–3.20 and § 21–28–4.09, as enacted by P.L. 1974, ch. 183, § 2. Doctor McAllister was indicted on forty-seven counts, twenty two charging violations of § 21–28–4.05(5) and § 21–28–4.05(7); and twenty-five counts of violating § 21–28–3.20 and § 21–28–4.09. In addition to these indictments, the grand jurors also reported to the court as follows:

"We, the Grand Jurors for the County of Newport, have received evidence and information relative to over-prescribing of medication and abusive medical treatment by three physicians in the city of Newport.

The focus of this investigation concentrated on people partaking in the Medicaid program as administered by the Department of Social and Rehabilitative Services. Records were produced demonstrating strong patterns of inordinate combinations of drug utilization by patients as well as questionable patterns of office visits by the patient to the physician.

Witnesses were subpoenaed to appear before us relative to the purpose of treatment; the nature of treatment; the utilization of medication as appears from prescriptions, the possibility of drug diversion, as well as the interrelationship of the drug community with the physicians. It became very apparent that the need for patient records was vital to the Grand

Jury in order to completely investigate the full breath and scope of the drug problem."

 Turning to the issue before us, when a situation arises wherein a state law conflicts with federal law, the United States Supreme Court has stated that we must "determine whether under the circumstances of this particular case [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604, 614 (1977); *Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). This inquiry requires that we consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written. *Jones v. Rath Packing Co.*, 430 U.S. at 526, 97 S.Ct. at 1310, 51 L.Ed.2d at 614. When the state law prevents accomplishment of the full congressional purpose, it must yield to the federal law. *Id.* at 543, 97 S.Ct. at 1318, 51 L.Ed.2d at 625.

This is the first case to come before us involving the Confidentiality of Health Care Information Act. That statute was enacted in 1978. Its stated purpose is "to establish safeguards for maintaining the integrity of confidential health care information that relates to an individual." § 5–37.3–2. No similar privilege existed at common law, *Banigan v. Banigan*, 26 R.I. 454, 59 A. 313 (1904), however, many states have created this privilege by statute. *See McCormick's Handbook of the Law of Evidence*, § 98 at 212 (2d Ed. Cleary 1972).

The trial justice found that § 5–37.3–6 of the act prohibited the grand jury from obtaining patient records in its investigation of the alleged Medicaid fraud. This section, entitled "Legal process," provides that "[E]xcept as provided in subparagraph (2) hereof, confidential health care information shall not be subject to compulsory legal process in any type of proceeding * * * and a patient or his authorized representative shall have the right to refuse to disclose, and to prevent a witness from disclosing, his confidential health care information in any such proceedings."[1] Subparagraph (2) provides five situations where the exemption from compulsory legal process and the privilege do not apply. None of these exemptions applies to the present case.[2]

It has been argued by the Attorney General that such an exception should be inferred from this section and from other sections in the act, notably § 5–37.3–4(b)(14), which provide that no consent is required for releasing confidential health-care information when the release is to a law-enforcement authority in order to protect the legal interests of an insurance-support organization in preventing and/or prosecuting the perpetration of fraud.

 Although the legislature may not have intended the privilege to apply to the situation in this case, the absence of an exemption for this situation in § 5–37.3–6 makes it difficult for us to infer one. The language of the act which prohibits obtaining confidential health-care information by compulsory legal process in any type of

---

**1.** "Confidential health care information" is defined as "all information relating to a patient's health care history, diagnosis, condition, treatment or evaluation obtained from a health care provider who has treated the patient. G.L.1956 (1976 Reenactment) § 5–37.3–3(c), as amended by P.L.1979, ch. 221, § 1.

**2.** Summarized, they are as follows:
(A) when an individual introduces his physical or mental condition as an element of his claim or defense;
(B) when, in a civil or criminal commitment proceeding, a physician determines that an individual is in need of treatment in a health-care facility for mental illness;

(C) when a court finds that an individual, after having been informed that the communications would not be privileged, has made communications to a psychiatrist in the course of a court-ordered psychiatric examination;
(D) when, in any court proceeding, it is demonstrated that the individual's physical or mental condition is an imminent and serious danger to the health of another person; and
(E) when, in a policy action involving the insured and the insurance carrier, it is demonstrated that the confidential health-care information is relevant.

proceeding reads broadly enough to cover the facts before us. Thus, the issue must be analyzed in terms of the conflict that occurs between the state created privilege and the federal Medicaid statutes contained in Subchapter XIX of the Social Security Act, 42 U.S.C.A. § 1396 (West 1974), enacted in 1965.

The Social Security Act authorizes federal grants to states for medical assistance to low-income persons who are aged sixty-five or over, and to blind or disabled persons, and to members of families with dependent children. The Medicaid program is one of the cooperative federalized welfare programs administered jointly by state and federal governments. Subchapter XIX provides that when a state has in effect a medical-assistance plan approved by the Secretary of Health and Human Services, part of the cost of the medical assistance will be paid for by federal funds as long as the state abides by its federally approved plan. 42 U.S.C.A. § 1396. Participation by a state in the Medicaid program is voluntary. However, a state that decides to participate in the Medicaid program must meet not only the requirements established by the federal statutory scheme but also the administrative guidelines promulgated pursuant to the statutes. 42 C.F.R. § 430.-0(b)(1) (1980). *See also T–H– v. Jones*, 425 F.Supp. 873, 877 (D.Utah 1975), *aff'd in part*, 425 U.S. 986, 96 S.Ct. 2195, 48 L.Ed.2d 811 (1976). *Schaak v. Schmidt*, 344 F.Supp. 99, 103 (E.D.Wis.1971). Compliance is mandatory. 42 U.S.C.A. § 1396a(a)(1). *See also Gould v. Klein*, 150 N.J.Super. 519, 376 A.2d 196 (1977). Upon a determination that a state is out of compliance with an approved Medicaid plan, the Secretary of the Department of Health and Human Services may withhold payments to the state. 45 C.F.R. § 201.6. *See also Arthur C. Logan Memorial Hospital v. Toia*, 441 F.Supp. 26 (S.D.N.Y.1977).

■ The continuation of federal funding was and is an important consideration for our Legislature as evidenced by several general laws dealing with the Medicaid program. General Laws 1956 (1977 Reenact-ment) § 40–8–1, declares that it is "the policy of this state to provide medical assistance for those persons in this state who possess the characteristics of persons receiving public assistance * * * and who do not have the income and resources to provide it for themselves or who can do so only at great financial sacrifice." Further, in § 40–8–12, the Department of Social and Rehabilitative Services of Rhode Island is empowered and authorized to submit its plan for medical assistance to the federal government for approval pursuant to the provisions of the federal Social Security Act. The department is authorized to make any arrangements or changes in its plan which become necessary to avoid any inconsistency with the requirements of the Social Security Act and the rules and regulations promulgated pursuant thereto. This authorization is made to ensure that the state secures the benefits of the federal Medicaid program to provide medical assistance for the needy. Finally, the intent of our Legislature to comply fully with the federal Medicaid laws is expressed in G.L.1956 (1979 Reenactment) chapter 18.1 of title 27, as assigned by P.L.1979, ch. 52, § 1, entitled "Compliance of Health Benefit Contracts And Medical Assistance Program With Federal Law." Section 27–18.1–1 states the legislative purpose of ensuring full federal support for the Rhode Island medical-assistance program by providing for full compliance with the federal Medicaid laws. In view of our Legislature's overwhelming expression of intent to continue to receive aid for the needy citizens of this state under the federal Medicaid laws, we must give full priority to the federal law when it conflicts with our own patient-physician privilege.

■ A reading of the federal Medicaid laws and the regulations promulgated thereunder discloses a clear congressional intention that the patient records kept by health-care providers be subject to disclosure during fraud investigations. Section 1396a(a)(27) requires that to be in compliance with federal law, a state plan for medical assistance must provide for agree-

ments with every person providing services under the state plan:

"(A) to keep such records as are necessary fully to disclose the extent of the services provided to individuals receiving assistance under the State plan, and (B) to furnish the State agency [or the secretary] with such information, regarding any payments claimed by such person or institution for providing services under the State plan, as the State agency [or the secretary] may from time to time request."

The concern for the welfare of Medicaid patients and for the state and federal treasuries justifies the statutory requirement that records be maintained by health-care providers and offered for inspection by responsible state agencies. *Miller v. Obledo*, 79 Cal.App.3d 714, 145 Cal.Rptr. 140 (1978).

■ It is true that the above subsection, 1396a(a)(27), requiring record keeping by health care providers speaks in terms of furnishing patient's records to the "State agency," and in Rhode Island that agency is the Department of Social and Rehabilitative Services. However, the federal regulations clearly encompass disclosure to law enforcement authorities as well. The regulations set forth state plan requirements, standards, procedures, and conditions for obtaining federal funds. 42 C.F.R. § 430.-0(b)(1) (1980). One requirement is that the disclosure of patient records be for "purposes directly connected with the administration of the plan." 42 C.F.R. § 431.301. This requirement was enacted to safeguard a patient's privacy rights while ensuring that privacy interests do not impede the administration of the plan. One of the specifically listed purposes is "[c]onducting or assisting an investigation, prosecution, or civil or criminal proceeding * * *." 42 C.F.R. § 431.302.

Regarding criminal investigations, federal law provides for the creation of a state Medicaid fraud control unit to protect the program from fraudulent practices. 42

U.S.C.A. § 1396b(q) (West Supp.1981). Subsection (1) of this section requires that the fraud control unit possess statewide authority to prosecute individuals for criminal violations. Subsection (2) states that the fraud control unit is separate and distinct from the state agency. Subsection (3) states that the fraud control unit's function is to investigate and to prosecute all aspects of fraud in connection with the Medicaid program. Subsection (4) authorizes the fraud control unit to act upon complaints of patient abuse or neglect under the criminal laws of the state. Subsection (5) provides that the fraud control unit shall collect any overpayments that are discovered by it in carrying out its activities. Finally, subsection (6) states that the fraud control unit shall employ the necessary personnel and be organized in such a manner as will promote effectiveness and efficiency.

These statutory requirements are expanded upon in the regulations. Section 455.21(a)(2) provides that when a fraud control unit determines that patient records may be useful in investigations of suspected fraud, it shall have

"[a]ccess to any information kept by providers to which the agency is authorized access. * * * In using this information, the unit must protect the privacy rights of recipients * * *."[3]

Further, pursuant to § 431.107, entitled "Required provider agreement," a state plan must provide for an agreement between the Medicaid agency and each provider furnishing services under the plan (including individual practitioners and groups of practitioners), in which agreement the provider agrees to:

"(1) Keep any records necessary to disclose the extent of services the provider furnishes to recipients;

"(2) On request, furnish to the Medicaid agency, the Secretary, or the State Medicaid fraud control unit (if such a unit has been approved by the Secretary under § 455.300 of this chapter), any in-

---

**3.** As indicated previously, the state agency is empowered to receive patient records disclosing the extent of services provided to individuals receiving Medicaid. 42 U.S.C.A. § 1396a(a)(27) (West 1974).

formation maintained under paragraph (b)(1) of this section and any information regarding payments claimed by the provider for furnishing services under the plan * * *." 42 C.F.R. § 431.107(b).

█ It is very clear from the federal statutes and regulations we have discussed that the disclosure of patient records for Medicaid fraud investigations is one of the requirements that a state must comply with to continue to receive federal Medicaid funds. And, as previously indicated, it is the stated purpose of our legislation to be in full compliance with federal law to ensure continued funding. § 27–18.1–1. In this regard, Rhode Island has a Medicaid Fraud Control Unit operating as an entity within the Attorney General's office. In the case before us, that unit was conducting the fraud investigation of Drs. Baumgartner and McAllister. The fraud control unit determined that the patient records of certain named patients were necessary to conduct the investigation. The grand jurors agreed with this assessment. Presumably, the patient records would serve to corroborate the testimony of patients who had been questioned before the grand jury, and the records could also provide additional evidence.

The federal Medicaid law speaks in terms of disclosing the records to the fraud control unit, and in the instant case the records are sought to be disclosed to the grand jury. We hold that this apparent variance is not an actual one. The fraud control unit conducts the investigation, in part, by invoking the powers of the grand jury. There is nothing illegal or irregular in this process. The traditional function of the grand jury in investigating violations of the criminal law is well established in our system of law enforcement. Without any question the federal Medicaid laws anticipated the employment of usual state process and procedure in conducting these investigations.

█ The federal policy requiring disclosure of patient records for fraud investi-

gations is very necessary to the continued viability of the Medicaid program. The statutorily created patient-physician privilege stands as an obstacle to the accomplishment and execution of this purpose. *Jones v. Rath Packing Co., supra.* By giving priority to the privilege, we would be keeping what might be the most persuasive evidence of criminal activity from the fraud control unit and the grand jury.[4] Therefore, we hold that the exemption from compulsory legal process for a patient's medical records cannot lawfully be invoked under the circumstances of this case. We hold further that the patient records that are available initially through the subpoenas duces tecum are limited to those records made in the course of furnishing Medicaid services to the named patients. Any additional records of medical treatment to a particular patient might also be available through subpoena but only after a showing to the court of materiality, relevancy, and/or necessity to a Medicaid fraud investigation in the particular case.

Although we have not previously considered an issue involving a conflict between state law and federal Medicaid laws, other jurisdictions have had occasion to invalidate a state law or policy that conflicts with various provisions of the Social Security Act. In *Massachusetts General Hospital v. Sargent,* 397 F.Supp. 1056 (D.Ma.1975), the court found that as long as the Commonwealth of Massachusetts participates in the Medicaid program, federal law, 42 U.S. C.A. § 1396a(a)(13)(D), requires a state plan to provide for payment of the reasonable costs of inpatient hospital services furnished under the plan. The court interpreted this requirement as meaning prompt payment, and thus invalidated the Commonwealth's practice of delaying authorization for payments. *Id.* at 1061–62. In *Fabula v. Buck,* 598 F.2d 869 (4th Cir. 1979), the Fourth Circuit Court of Appeals held that a Maryland regulation denying Medicaid benefits to patients who had transferred prop-

---

4. Professor McCormick has noted that more than a century of experience with statutorily created physician-patient privileges "has demonstrated that the privilege in the main operates not as the shield of privacy but as the protector of fraud." *McCormick's Handbook of the Law of Evidence* § 105 at 228 (2d ed. Cleary 1972).

erty for the purpose of establishing Medicaid eligibility conflicted with a provision of the federal regulations which provided that a state must not use requirements for determining eligibility that are more restrictive than those used under the Supplemental Security Income Program. 42 C.F.R. § 435.401(c). Since no restriction regarding transfer of assets is imposed on SSI applicants, the court found that the Maryland regulation may not be enforced. *Fabula v. Buck*, 598 F.2d at 874.

A case with a closer factual pattern to the one before us is *Department of Social and Health Services v. Latta*, 92 Wash.2d 812, 601 P.2d 520 (1979). The Supreme Court of Washington reviewed a Superior Court order quashing a subpoena duces tecum seeking medical records of Medicaid patients, which order was based upon their state statutory physician-patient privilege. The records were sought by the Department of Social and Health Services to conduct an administrative review and audit as required by federal law. 42 U.S.C.A. § 1396a(a)(27) and (30). Addressing the conflict between the state privilege and the federal Medicaid law, the court noted:

> "[p]roviders of services under the program initially must agree to abide by applicable federal and state statutes and regulations. They must keep 'such records as are necessary fully to disclose' the extent of services provided. In addition, they must furnish DSHS information regarding payments claimed for providing Medicaid services. * * * We think it clear that the matter of physician-patient privilege simply does not arise under these circumstances." *Id.* at 820–21, 601 P.2d at 525–26.

Even though the privilege in *Latta* was limited by statute to medical information disclosed in civil actions, the fact that the Rhode Island privilege is broader does not make it any less an intrusion upon federal law. If anything, the intrusion is greater since providers could attempt to invoke it to prohibit any use of patient records contemplated by federal law; i.e. administrative audits or the ferreting out of fraudulent practices.

For the reasons stated herein, the state's appeal is sustained, the order quashing the subpoenas duces tecum is vacated, and the papers of the case are remanded to the Superior Court for further proceedings consistent with this opinion.