[No. B100434. Second Dist., Div. Three. Nov. 27, 1996.]

MACARIO C. BRILLANTES, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Marks & Brooklier, Donald B. Marks and Raymond B. Kim for Petitioner.

No appearance for Respondent.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Thomas A. Temmerman, Assistant Attorney General, and Malcolm Venolia, Deputy Attorney General, for Real Party in Interest.

## OPINION

**KITCHING, J.**—In this action for mandamus relief, we consider whether a physician suspected of Medi-Cal fraud should be afforded, as a matter of right under *People* v. *Superior Court (Bauman & Rose)* (1995) 37 Cal.App.4th 1757 [44 Cal.Rptr.2d 734] (hereafter *Bauman & Rose*), a Penal Code section 1524, subdivision (c) hearing[1] to determine the applicability of the physician-patient privilege to patient files seized from his office pursuant to a search warrant.[2]

*Bauman & Rose* recognized the trial court's authority to hold an in camera hearing to determine the validity of the assertion of the attorney-client privilege by an attorney regarding documents seized from his office, even though the attorney was suspected of criminal activity. *Bauman & Rose*, however, did not determine the trial court was *required* to provide such an in camera hearing.

Under the facts of this case, we decline to apply *Bauman & Rose* to a physician suspected of Medi-Cal fraud and decide that the trial court was not required to provide him an in camera hearing and file review. We find that a trial court has the inherent authority to determine the applicability of the physician-patient privilege, and also has the discretion to fashion an appropriate remedy to protect the interests and confidentiality of the Medi-Cal patients.

The trial court did not abuse its discretion in denying the physician's motion for a sealing order. The petition is denied. The stay imposed by this court shall remain in effect until issuance of the remittitur.

### FACTUAL AND PROCEDURAL BACKGROUND

Dr. Macario C. Brillantes (Brillantes), a physician enrolled as a provider under California's Medi-Cal statutes (Welf. & Inst. Code, § 14000 et seq.),

---

[1]Subdivision (c) of section 1524 provides, in relevant part, that ". . . no search warrant shall issue for any documentary evidence in the possession or under the control of any person, who is a lawyer . . . , a physician . . . , a psychotherapist . . . , or a clergyman . . . , *and who is not reasonably suspected of engaging or having engaged in criminal activity* related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with: [¶] (1) At the time of the issuance of the warrant the court shall appoint a special master . . . [who] shall inform the party served of the specific items being sought and the party shall have the opportunity to provide the items requested . . . . [¶] (2) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing. [¶] At the hearing the party searched shall be entitled to raise any issues which may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided by law. Any such hearing shall be held in the superior court." (Italics added.)

[2]Unless otherwise indicated, all statutory references are to the Penal Code.

is suspected of engaging "in a criminal scheme that defrauded the Medi-Cal program by receiving payment for false and fraudulent claims . . . submitted to an agent of the state, Electronic Data Systems (EDS), the fiscal intermediary, in violation of Welfare & Institutions Code section 14107 (Submission of False Claims), Welfare & Institutions Code section 14107.2 (Kickbacks) and Penal Code section 487.1 (Grand Theft)."[3]

Attorney General investigators from the Bureau of Medi-Cal Fraud served a search warrant on Brillantes's residence and medical offices. The warrant was issued on the basis of a 60-page affidavit signed by Fraud Unit Investigator Harry Blair (Blair). According to the affidavit, informants told investigators Brillantes's clinic was established to bill Medi-Cal for services provided to "ghost patients" who never actually visited the clinic. The clinic would pay "drivers" a fee for each Medi-Cal card or beneficiary name and number they brought to the clinic. Unlicensed medical staff would prepare false medical histories for the "ghost patients" and the clinic would then submit false bills to the State of California for the alleged services. Seventeen investigative surveillances corroborated the informant's statements. The affidavit reflects that on each surveillance date, billings from Brillantes's clinic substantially exceeded the number of potential patients observed entering the clinic. Blair concluded Brillantes had billed Medi-Cal for medical services he did not perform and had received payments from the state.

During the search, the investigators seized, among other items, billing and payment records and Medi-Cal patient files from January 1, 1994, to the present. These documents reflected health care services provided Medi-Cal beneficiaries, and were relevant to the possibility that Brillantes defrauded Medi-Cal.[4] No special master had been appointed or had participated in the search.

---

[3]In addition to Brillantes, the search warrant affidavit also named Eleanor Romero Evangelista also known as Eleanor J. Romero, Dr. Agnes Lopez Lorenzo, Dr. Pachagiri R. Lakshmipathy, and Dr. Sergio I. Trani as being involved in the fraudulent health care scheme. Brillantes is the only petitioner in this action.

[4]At the hearing on Brillantes's motion to seal, the trial court inquired as to the number of files, Medi-Cal patients versus private patients, that were taken during the search. The deputy attorney general responded: "We went in with a list of names. [¶] My understanding is that that list of names was generated by—they are [Medi-Cal] patients only, but those specifically were the patients who there were billings for on the dates of our surveillances which showed far more billings on a given day than the number of patients walking in. [¶] So it was a very limited selection. There should be nothing from private patients." When asked if he had a quarrel with counsel's assertion that only Medi-Cal patient files, and not private patient files were seized, Brillantes's attorney stated, "I don't know offhand, your honor. I can't speak to that quite frankly. I just don't know." However, a list of names is not attached to the search warrant.

Brillantes filed an objection to the search and seizure and a motion for a sealing order. The premise of the physician's argument was that even though he was a suspect in a criminal investigation, *Bauman & Rose* gave him the right to an in camera review of patient files to determine the applicability of the physician-patient privilege. In opposition, the People argued the physician-patient privilege was inapplicable and an in camera hearing was not a matter of right. The People also argued that patient confidentiality in the seized files was best determined, not by assertion of the physician-patient privilege, but by consideration of the privacy interests of the Medi-Cal beneficiaries in their medical records.

After a series of hearings, the trial court denied Brillantes's motion and issued a protective order controlling dissemination of information from the seized documents, but sealed the patients' files for 30 days to allow Brilliantes to request mandamus relief in this court. To support its ruling, the trial court determined: (1) *Bauman & Rose* involved attorney-client privilege, which afforded greater protections than did the physician-patient privilege; (2) the physician-patient privilege had questionable applicability at this preliminary stage of the proceedings; and (3) while the patients' constitutional privacy rights protected their records, their participation in the Medi-Cal program circumscribed that privacy.[5]

Brillantes filed a petition for writ of mandate and request for an extension of the trial court's stay order. This court issued an alternative writ and

---

[5]At the hearing, the trial court stated, in relevant part:

"Under the *Reynaud* [v. *Superior Court* (1982) 138 Cal.App.3d 1 (187 Cal.Rptr. 660)] case, I don't believe that the privilege applies at this stage of the proceedings.

"The statutory privilege means that we are to, I believe, look to whatever common law or constitutional privacy exists.

"There is a constitutional right to privacy that would protect these records to some degree. That is greatly attenuated by both the . . . Welfare and Institutions Code statute, and by the waivers that I believe the patients must give when obtaining coverage at taxpayers' expense and payments at taxpayers' expense.

"Further, as stated in the *Reynaud* case, it appears to me, and I do conclude, that [Medi-Cal] patients are deemed to know that their records may be inspected from time to time by agents of the state for the purpose of administering the program and for the purpose of determining whether payments are legitimate and whether treatment is legitimate and whether treatment is being, in fact, given by licensed health care employees and those entitled to do so.

"In that sense I don't believe that there is any real likelihood that the patients here have any interest in seeing that their records remain confidential.

"It would seem to me quite the contrary, that a patient is entitled to know and have the state know whether or not they have in fact been given treatment that they have been billed for and, most importantly, whether they have been given the treatment by someone who is entitled to give treatment and who is competent in giving treatment . . . .

"So there is very little privacy interest in those records by virtue of the program and the way it is administered. And whatever is left I feel must certainly yield to the compelling interest of the state in making sure that its limited resources are not stolen and that the state is not defrauded and potentially injured.

extended the trial court's stay order "until disposition of this petition or further order of this court." We then heard oral argument.

## DISCUSSION

*The Trial Court Is Not Required to Provide a Section 1524, Subdivision (c) Hearing to a Physician Suspected of Medi-Cal Fraud.*

 The heart of Brillantes's argument is that even though he is suspected of criminal activity, *Bauman & Rose* provides him an absolute right to a hearing to assert the physician-patient privilege and an in camera review of the seized files. Brillantes's argument, however, erroneously assumes the law requires the trial court to ensure patient confidentiality by these procedures, even in cases where a physician is suspected of Medi-Cal fraud. Such a requirement would negate the court's discretion to determine the applicability of the privilege and its ability to fashion the appropriate remedy to best protect the interests of the patients.

For reasons explained below, we conclude that *Bauman & Rose* does not require the trial court to provide Brillantes a section 1524, subdivision (c) hearing. Instead, *Bauman & Rose* merely grants the trial court authority to conduct such a hearing when and if, under the circumstances of the case, the court determines that procedural safeguard to be the best means to control dissemination of privileged materials and to ensure patient confidentiality.

a. *Brillantes Has No Statutory Right to a Hearing Under Section 1524.*

In 1979, as the result of a search warrant executed on a law firm and concomitant concerns regarding violation of the attorney-client privilege, "attorneys sought legislation to protect the confidentiality of their files. . . . [¶] In recognition of the valid and sometimes crucial role search warrants serve in the continuing struggle against sophisticated white-collar crime and the basic need to protect privileged material in the possession of attorneys,

---

"The court has reread the affidavit and the court knows that there is more than probable cause to believe that widespread abuses were taking place at the various location[s] and sham transactions were involved and that the operation was rife with fraud.

"That being the case, it would be a needless act on the court's part to sit now and go through the patient files because were I to do so, and even were I to conclude that some privileged information was contained therein, the court would rule and does rule that the overriding interest in the state prosecuting the crime and uncovering wrongdoing and not letting their precious tax dollars be [s]quandered by thieves overrides any such claim of privilege or privacy that the patients may have.

"Further, I believe this. That it would be and will be a rather simple matter to make sure that there is no abuse [by the Attorney-General investigators], unnecessary abuse, of the information gleaned from those files"

among others, and by compromising and balancing these strong competing societal interests, the Legislature filled the existing void with procedural protections. [¶] The Legislature's vanguard efforts are reflected in significant amendments to the statutory scheme governing search warrants, found in Penal Code sections 1523 to 1542, and to the Evidence Code section dealing with privileges. [¶] Effective January 1, 1980, and as amended, Penal Code section 1524 [provided for] specified procedures to be followed in the issuance and execution of warrants relating to the offices and files of lawyers and others who claim statutory privileges." (*Deukmejian* v. *Superior Court* (1980) 103 Cal.App.3d 253, 258 [162 Cal.Rptr. 857]; see also *People* v. *Blasquez* (1985) 165 Cal.App.3d 408, 412 [211 Cal.Rptr. 335].)[6]

■ Section 1524, subdivision (c) specifically provides if the attorney, physician, psychiatrist, or clergyman "is reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested, the protection of having the search conducted by a special master and the holding of a hearing in superior court is not provided." (*People* v. *Blazquez, supra,* 165 Cal.App.3d at p. 410.) The legislative intent, shown by the language of the statute, was to limit the special master and hearing protections only to those members of the enumerated professions not suspected of criminal activity. These mechanisms would "protect the privacy of privileged communications and of other records of persons not suspected of criminal activities." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1609 (1979-1980 Reg. Sess.) as amended Aug. 20, p. 2.)

In our case, ". . . the seized records were under the control of [Brillantes] who was reasonably suspected of having engaged in criminal activity related to the documentary evidence for which the warrant was requested." (*People* v. *Blazquez, supra,* 165 Cal.App.3d at p. 410.) ■ Under the plain language of 1524, subdivision (c), Brillantes does not have a statutory right to either a special master or a hearing because he is suspected of criminal activity. Brillantes does not dispute that finding. He argues, however, that *Bauman & Rose* gives him a right to a hearing and an in camera review of the files.

b. *Brillantes Does Not Have an Absolute Right to a Hearing Under Bauman & Rose.*

In *Bauman & Rose,* on which Brillantes exclusively relies, the People sought relief from the trial court's order sealing documents, including client

---

[6]Assembly Bill No. 1609, as amended, reflects the current provisions of section 1524.

files, seized from the office of an attorney suspected of insurance fraud. (*Bauman & Rose, supra*, 37 Cal.App.4th at p. 1762.) A special master had not been appointed for the search of the location. (*Ibid.*) The *Bauman & Rose* court considered "whether an attorney suspected of criminal activity is entitled to an in camera hearing on the applicability of the attorney-client privilege to client files seized from the attorney's office pursuant to a valid search warrant or if the privilege has been waived on grounds of the crime/fraud exception to the privilege. [Citation.]" (*Id.* at pp. 1763-1764.)

To answer this question, the court first looked at the search warrant statutory scheme and its legislative history. It concluded that while the "special master procedure set forth in Penal Code section 1524, subdivision (c) . . . [did] not apply to attorneys suspected of criminal activity," the statute did "not reach the issue of the assertion of the attorney-client privilege by a suspect attorney." (*Bauman & Rose, supra*, 37 Cal.App.4th at pp. 1764-1765.)

The court then examined both the nature of the attorney-client privilege and "the court's inherent power to determine its applicability." (*Bauman & Rose, supra*, 37 Cal.App.4th at p. 1765.) The court reasoned, in part, that "[t]he fact that the attorney is suspected of criminal activity does not lessen the client's interest in the confidentiality of his or her files, or obviate the privilege with respect to those files. As we have noted, a suspect attorney no less than a nonsuspect attorney is entitled to assert the privilege on behalf of his or her client and to have that claim adjudicated by the court." (*Id.* at p. 1766.) "This conclusion," the court stated, "[was] supported by *Deukmejian v. Superior Court, supra*, 103 Cal. App.3d at page 260, and by analogy, *PSC Geothermal Services Co. v. Superior Court, supra*, 25 Cal.App.4th 1697." (*Ibid.*)

In *PSC Geothermal Services Co. v. Superior Court* (1994) 25 Cal.App.4th 1697 [31 Cal.Rptr.2d 213], the district attorney seized documents, including privileged correspondence, from the offices of environmental consultants hired by a law firm to assist in defending various lawsuits. The section 1524 procedures were inapplicable. Nevertheless, *PSC Geothermal* determined that the importance of the attorney-client privilege, and the duty of the trial court to prevent disclosure of privileged materials, required assertion of the evidentiary privilege in that search warrant proceeding.[7]

The *PSC Geothermal* court explained that even though "the special master and hearing procedures of section 1524 do not apply because the search was

---

[7]As discussed in *PSC Geothermal*, " '[t]he attorney-client privilege has been a hallmark of Anglo-American jurisprudence for almost 400 years. [Citations.] The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client. (Evid. Code, § 950 et seq.) Clearly, the fundamental

not of the offices of one of the four professions listed in section 1524, it does not follow that the execution of the search warrant was beyond the court's control. [¶] The District Attorney assumes that if section 1524 does not apply, then the allegedly privileged documents and work product lose their protection and are freely discoverable. Whether the documents here are privileged, however, does not depend on section 1524 but on whether, pursuant to Evidence Code section 950 et seq., there has been confidential communication between attorney and client which has not been disclosed. . . . [T]he question here is whether a court can control disclosure of allegedly privileged documents which have been seized pursuant to a search warrant." (25 Cal.App.4th at p. 1708.)

The *PSC Geothermal* court reviewed the purposes of the attorney-client privilege and the work product rule. The court then noted "the search was not a typical search for evidence and the fruits of criminal activity. . . . Rather, it appears to be a search designed, at least in part, to penetrate the defense theories of the case by obtaining communications among possible defendants, their attorneys and consultants. Unlike other searches, this search pits a defendant's Sixth Amendment protections against the prosecution's pursuit of a criminal investigation." (25 Cal.App.4th at p. 1710.) The court then reasoned that the trial court could "meet both its responsibility under the Fourth Amendment to issue search warrants as well as its responsibility under the Sixth Amendment to protect the right to counsel" by conducting "an in camera review of materials seized under the search warrant to determine whether the materials are covered by the attorney-client or work product privileges and therefore should not be disclosed to the government." (*Id.* at pp. 1711.)

The *Bauman & Rose* court noted the factual differences between *PSC Geothermal* and the case before it, but considered those differences "less

---

purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.] In other words, the public policy fostered by the privilege seeks to ensure the "right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." [Citation.] [¶] 'Although exercise of the privilege may occasionally result in the suppression of relevant evidence, the Legislature of this state has determined that these concerns are outweighed by the importance of preserving confidentiality in the attorney-client relationship. As this court has stated: "The privilege is given on grounds of public policy in the belief that the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence." [Citations.] [¶] '. . . While it is perhaps somewhat of a hyperbole to refer to the attorney-client privilege as "sacred," it is clearly one which our judicial system has carefully safeguarded with only a few specific exceptions.' (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599-600. . . .)" (25 Cal.App.4th at p. 1709.)

important than the court's analysis of the relationship between section 1524, subdivision (c) and a trial court's inherent power to determine the applicability of the attorney-client privilege in situations not governed by section 1524." (*Bauman & Rose, supra,* 37 Cal.App.4th at p. 1767.) Accordingly, *Bauman & Rose* concluded that ". . . a trial court has the authority to hold an in camera hearing to determine the validity of the assertion of the attorney-client privilege by an attorney suspected of criminal activity, notwithstanding section 1524." (*Ibid.*)

*Bauman & Rose* then found support for this determination in *People* v. *Hepner* (1994) 21 Cal.App.4th 761 [26 Cal.Rptr.2d 417] and *McKirdy* v. *Superior Court* (1982) 138 Cal.App.3d 12 [188 Cal.Rptr. 143], neither of which involved assertion of the attorney-client privilege.

*Hepner* and *McKirdy* concerned the protection of patients' privacy rights in files seized from offices of psychiatrists suspected of engaging in insurance fraud. (*Bauman & Rose, supra,* 37 Cal.App.4th at pp. 1767-1770.) In both cases, the doctors argued that use of the files would violate their patients' rights of privacy. *Hepner* rejected the psychiatrist's "privacy claim on the grounds that the magistrate's decision to issue the warrant sufficiently implied a determination that the patient's privacy rights should give way to the limited extent necessary to execute the search warrant. [Citation.]" (*Id.* at p. 1767.) The *Hepner* court "went on to note, however, that had the court been concerned with the privacy issue, it 'maintained ultimate control over this property and could have issued protective orders to prevent improper disclosures if necessary.' [Citation.]" (*Id.* at pp. 1767-1768.)

The *Bauman & Rose* opinion specified that it was dealing with attorney records and the nature of the concomitant privilege. It concluded that allowing the suspect attorney to assert the privilege and obtain section 1524 procedural safeguards, outside the statutory scheme, was the best way to control the flow of confidential material and protect the rights of the clients. The decision to hold an in camera hearing was not required as a matter of law, but appropriately left to the trial court's discretion. *Bauman & Rose,* however, concerned only the attorney-client privilege. The opinion did not discuss any of the other privileges.

We find *Bauman & Rose* was grounded in the importance of the attorney-client privilege. It does not conclude that statutory hearings are required in all cases involving the protection of a client's rights, but instead holds that a court has the inherent power to protect a privilegeholder from improper disclosure of confidential information. A trial court can use that inherent power to fashion safeguards based on a particular factual situation. The

factual situation will best determine whether the safeguard can be developed by applying a privilege or by balancing the privacy rights of a client or patient with other public policy considerations.

 c. *In a Medi-Cal Fraud Investigation, the Confidentiality of Patients' Medical Records Are Best Protected by the Assertion of Their Privacy Rights.*

In our case, we are dealing not with the attorney-client privilege, but instead with the attempted assertion of the physician-patient privilege.[8]

 ■ " 'The whole purpose of the [physician-patient] privilege is to preclude the humiliation of the patient that might follow disclosure of his ailments. . . .' [Citation.] The privilege is statutory and 'encourage[s] the patient to be free in disclosing facts about his illness to enable the physician to treat the illness or maintain the patient's general health. [Citation.] "The rules of privilege are designed to protect personal relationships and other interests where public policy deems them more important than the need for evidence." [Citation.]' [Citation.]" (*Palay* v. *Superior Court* (1993) 18 Cal.App.4th 919, 927-928 [22 Cal.Rptr.2d 839].)

 (1) *In This Case, Privilege Would Not Protect the Interests of the Patients.*

 ■ We are first concerned that an attempt by a physician accused of Medi-Cal fraud to invoke this privilege on behalf of his patients, would serve to benefit only the physician, to the patient's detriment.[9]

In *Reynaud* v. *Superior Court* (1982) 138 Cal.App.3d 1 [187 Cal.Rptr. 660], a psychiatrist enrolled as a Medi-Cal provider was charged by information with grand theft and presenting false Medi-Cal claims. (*Id.* at p. 4.)

---

[8]Evidence Code section 994 provides, in relevant part, that, "[s]ubject to Section 912 and except as otherwise provided in this article, the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician if the privilege is claimed by: [¶] (a) The holder of the privilege; [¶] (b) A person who is authorized to claim the privilege by the holder of the privilege; or [¶] (c) The person who was the physician at the time of the confidential communication, but such person may not claim the privilege if there is no holder of the privilege in existence or if he or she is otherwise instructed by a person authorized to permit disclosure."

[9]The parties also argue whether the physician-patient privilege is applicable to a search warrant procedure because Evidence Code section 998 provides that "[t]here is no privilege under this article in a criminal proceeding." We need not decide whether the search warrant procedure in this matter is a criminal proceeding within the meaning of Evidence Code section 998, or if the privilege exists at this stage of the proceedings, in light of our ruling that a trial court has the inherent authority to fashion an appropriate remedy to protect the interests of Medi-Cal patients and ensure patient confidentiality.

Reynaud unsuccessfully moved to suppress certain records and documents and then sought mandamus review on grounds that use of the records would violate his patients' privacy rights and statutory psychotherapist-patient privileges. (*Ibid.*) In discussing assertion of the psychotherapist-patient privilege, the court observed that "[a]s described in the record the Blue Shield documents reflect identification and diagnostic conclusions necessarily based on presumably confidential . . . psychotherapist-patient communications and, thus, would be subject to the privilege unless application of the privilege has been waived or is otherwise barred. . . . So far as the record shows no patient has either asserted or waived the privilege in this action." (*Id.* at p. 10.)

Reynaud argued he was required to assert the privilege by Evidence Code section 1015.[10] (*Reynaud* v. *Superior Court, supra,* 138 Cal.App.3d at p. 10.) The appellate court disagreed, and determined that it would be inappropriate to permit the psychiatrist to claim the privilege. The *Reynaud* court reasoned that by invoking the privilege, Reynaud himself would be the exclusive arbiter of what would be considered confidential information, and therefore, privileged. This would be counterproductive, the appellate court decided, because the documents subject to review contained false information Reynaud himself had provided in order to defraud Medi-Cal. The trial court, therefore, need not rely on *Reynaud*'s interpretation of that information. (*Ibid.*)

The *Reynaud* court also determined that ". . . it remains proper for the [trial] court to make a preliminary determination whether the information in issue 'is subject to a claim of privilege.' It is our view that in the circumstances at record, a trial court could properly conclude that a Medi-Cal patient could be deemed to know that for the limited purpose of obtaining public payment for his treatment certain narrowly circumscribed information concerning him must be communicated to the state and be and remain subject to state audit, that to that extent and for that purpose the patient did not intend his communications to be confidential in the sense requisite to the privilege, and that, therefore, the Blue Shield documents would not in the circumstances be subject to the psychiatrist-patient privilege." (138 Cal.App.3d at p. 11.)

---

[10]Evidence Code section 1015 provides that "[t]he psychotherapist who received or made a communication subject to the privilege under this article shall claim the privilege whenever he is present when the communication is sought to be disclosed and is authorized to claim the privilege under subdivision (c) of Section 1014."
Evidence Code section 995 provides identical language for physicians.

(2) *The Physician-Patient Privilege Must Yield to the Reporting Provisions of the Medi-Cal Program.*

We are next concerned that an effort by Brillantes to assert the privilege would conflict with, and be limited by, the reporting provisions of the Medi-Cal program.

"In 1965, Congress established the federal Medicaid program, 'a cooperative federal-state health benefits assistance program designed to provide necessary medical services to low income persons. [Citations.] State governments principally administer the program, and in so doing must abide by the requirements of [Title XIX of the Social Security Act] to qualify for receipt of federal Medicaid funds. [Citations.] California participates in the Medicaid program through its California Medical Assistance Program ("Medi-Cal"), which provides medical services to aged, disabled, and needy persons. [Citations.]' [Citation.]" (*Department of Health Services* v. *Superior Court* (1991) 232 Cal.App.3d 776, 778 [283 Cal.Rptr. 546].)

■ Medi-Cal providers, including physicians such as Brillantes, must maintain records of health services provided to beneficiaries, and must make those records available for state audits and inspections. (Welf. & Inst. Code, §§ 14124.1, 14124.2; *Miller* v. *Obledo* (1978) 79 Cal.App.3d 714, 715-716 [145 Cal.Rptr. 140].) The records are reviewed to monitor the quality of care received by the Medi-Cal beneficiary. Brillantes is required to make available records relating "to his treatment of patients for whose care the department was responsible. The state's concern both for the welfare of the patients and for the public fisc justified the requirement that such records be maintained and offered for inspection by the responsible state agency." (*Miller* v. *Obledo, supra*, 79 Cal.App.3d 714, 718.)

The information on Medi-Cal beneficiaries is confidential, but it can be examined for "[p]urposes directly connected with the administration of the Medi-Cal Program." (Welf. & Inst. Code, § 14100.2, subd. (c).) "Purposes directly connected with the administration of the Medi-Cal Program . . . encompass those administrative activities and responsibilities the State Department of Health Services and its agents are required to engage in to insure effective program operations. Such activities include . . . conducting or assisting an investigation, prosecution, or civil or criminal proceeding related to the administration of the Medi-Cal Program; . . . ." (*Ibid.*) Such activities also include investigation for Medi-Cal fraud.

Courts in Rhode Island, Washington State, and New York have precluded physicians from asserting the privilege in Medicaid fraud investigations.

These courts analyzed the relationship between the physician-patient privilege and the disclosure requirements of the state and federal Medicaid laws, and determined state laws creating the physician-patient privilege must yield to the Medicaid disclosure requirements. We find these cases instructive, persuasive, and pertinent to the issue before us.

In *In re Grand Jury Investigation* (R.I. 1982) 441 A.2d 525, a physician's records were subpoenaed by the grand jury during a Medicaid fraud investigation. (*Id.* at p. 527.) The Rhode Island Supreme Court analyzed the relationship between the state's physician-patient privilege and the federal Medicaid disclosure requirements. (*Id.* at pp. 527, 529.) After reviewing cases from other states and the Medicaid statutes, the court determined that "[a] reading of the federal Medicaid laws and the regulations promulgated thereunder disclose[d] a clear congressional intention that the patient records kept by health-care providers be subject to disclosure during fraud investigations." (*Id.* at p. 529.) Citing *Miller* v. *Obledo, supra,* 79 Cal.App.3d 714, the court reasoned "[t]he concern for the welfare of Medicaid patients and for the state and federal treasuries justifie[d] the statutory requirement that records be maintained by health-care providers and offered for inspection by responsible state agencies." (441 A.2d at p. 530.)

The Rhode Island Supreme Court then stated it was "clear from the federal statutes and regulations . . . that the disclosure of patient records for Medicaid fraud investigations is one of the requirements that a state must comply with to continue to receive federal Medicaid funds." (*In re Grand Jury Investigation, supra,* 441 A.2d at p. 531.) The court held "that the exemption from compulsory legal process for a patient's medical records cannot lawfully be invoked under the circumstances in this case." (*Ibid.*) That was because "[t]he federal policy requiring disclosure of patient records for fraud investigations is very necessary to the continued viability of the Medicaid program. The statutorily created patient-physician privilege stands as an obstacle to the accomplishment and execution of this purpose. . . . By giving priority to the privilege, we would be keeping what might be the most persuasive evidence of criminal activity from the fraud control unit and the grand jury. [Fn. omitted.]" (*Ibid.*)

The *Grand Jury* court also noted that in matters "involving a conflict between state law and federal Medicaid laws, other jurisdictions have had occasion to invalidate a state law or policy that conflicts with various provisions of the Social Security Act." (*In re Grand Jury Investigation, supra,* 441 A.2d at p. 531; see also *State, Dept. of Soc. and Health Services* v. *Latta* (1979) 92 Wn.2d 812 [601 P.2d 520].)

In *Camperlengo* v. *Blum* (1982) 56 N.Y.2d 251 [451 N.Y.S.2d 697, 436 N.E.2d 1299], the New York State Department of Social Services subpoenaed 35 of a psychiatrist's Medicaid patient files to determine if "there had

been unnecessary treatment or fraud in billing procedures." (*Id.* at pp. 254-255 [436 N.E.2d at p. 1300].) The psychiatrist unsuccessfully moved to quash the subpoena, and on appeal asserted that the requested treatment records were protected by the physician-patient privilege. (*Id.* at p. 255 [436 N.E.2d at p. 1300].) The court looked at other circumstances in which the legislature had invalidated the physician-patient privilege "to effectuate some other public policy, such as the detection and prevention of child abuse . . . or the treatment of narcotic addiction . . . ," and considered "whether and to what extent the State and Federal regulatory provisions of the Medicaid program have also created an exception to the privilege." (*Ibid.*)

The court reviewed the purpose of the Medicaid program and reasoned: "The Medicaid program uses public funds to help provide medical services to needy persons. For this program to be carried out effectively, 'the public must be assured that the funds which have been set aside for this worthy purpose will not be fraudulently diverted into the hands of an untrustworthy provider of services.' [Citation.] To this end, the Medicaid program requires that certain information be made available to those charged with administering the program. [¶] . . . [¶] Although there is no express statutory exception to the privilege for Medicaid-related records, the Federal and State record-keeping and reporting requirements evidence a clear intention to abrogate the physician-patient privilege to the extent necessary to satisfy the important public interest in seeing that Medicaid funds are properly applied. . . . [T]he use of information obtained pursuant to the record-keeping requirements is restricted to purposes directly connected with administering the Medicaid program, and disclosure is otherwise prohibited. [Citations.]" (*Camperlengo* v. *Blum, supra,* 56 N.Y.2d at pp. 255-256 [436 N.E.2d at pp. 1300-1301].)

In *People* v. *Bhatt* (1994) 160 Misc.2d 973 [611 N.Y.S.2d 447], involving a grand jury investigation into alleged Medicare fraud by an orthopedic surgeon, the New York Supreme Court relied on *Camperlengo* v. *Blum* and similar cases, to decide "that in order to effectuate the objectives and regulatory provisions of the Medicare program, an exception to the physician-patient privilege . . . must be created to permit appropriate oversight of the Medicare program." (*Id.* at p. 981 [611 N.Y.S.2d at p. 452].) Furthermore, the court stated, "[t]hose charged with such [fraud] investigations should have an unqualified right to review all records needed for their investigation, notwithstanding that they may contain privileged, and extremely sensitive, material, so long as the disclosure and use of such material is limited to purposes directly related to the Medicare investigation." (*Ibid.*)

As to the assertion of the physician-patient privilege, the *Bhatt* court went on to express concern, similar to that voiced by the California court in

*Reynaud,* that "'a person or entity subject to proceedings for having committed crimes against an individual should not be permitted to assert the victim's physician-patient privilege as a bar to production of relevant medical records or testimony . . . [t]he purpose of the privilege is to protect the patient, not to shield the criminal' [citation]." (160 Misc.2d at p. 976 [611 N.Y.S.2d at p. 449].)

■ We conclude that in this Medi-Cal fraud investigation, the disclosure and reporting provisions of the Medi-Cal program restrict, and may invalidate, Brillantes's right to assert the privilege on behalf of his patients.

(3) *The Patients' Constitutional Right to Privacy Must Be Balanced Against the State's Right to Investigate and Prosecute Medi-Cal Fraud.*

We next discuss whether (1) Brillantes's Medi-Cal patients had a privacy interest in their medical files; (2) if the procedure used to seize the files violated these privacy rights; and (3) if these privacy rights were impliedly waived. Under *McKirdy* v. *Superior Court, Reynaud* v. *Superior Court,* and applicable Welfare and Institution Codes, we find that the Medi-Cal patients had only a limited privacy interest in their records, and that there was no violation of this interest.

■ We begin with the premise that "[o]ur right to privacy is guaranteed and protected by state and federal Constitutions." (*Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 931.) It has been acknowledged that "'[f]undamental to our privacy is the ability to control circulation of information.' [Citation.] '[F]undamental to the privacy of medical information "is the ability to control [its] circulation. . . ."' [Citation.]" (*Id.* at p. 932.) To determine if there is a right to privacy in the medical records in dispute, we examine the nature of the information sought. (*Ibid.*)

"The constitutional right to privacy is not absolute. [Citations.] It may be outweighed by supervening concerns. [Citation.] The state has enough of an interest in discovering the truth in legal proceedings, that it may compel disclosure of confidential material. [Citation.] '[A]n individual's medical records may be relevant and material in the furtherance of this legitimate state purpose . . . .' [Citation.] An 'intrusion upon constitutionally protected areas of privacy requires a "balancing of the juxtaposed rights, and the finding of a compelling state interest." [Citations.]' [Citation.]" (*Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 933.)

In *McKirdy,* pursuant to a search warrant, the Attorney General's Medi-Cal Fraud Unit seized records and files from the home and office of a

psychiatrist suspected of engaging in Medi-Cal fraud. (*McKirdy* v. *Superior Court, supra,* 138 Cal.App.3d at pp. 16-18.) Invoking his rights under section 1524, McKirdy successfully moved to quash the warrant in municipal court, but the order was vacated by the superior court. (138 Cal.App.3d at p. 16.)

McKirdy filed a petition for writ of mandate and challenged the ruling on the ground that the section 1524, subdivision (c) exclusion of a special master for "a document custodian reasonably suspected of relevant criminal activity," was unconstitutional and violated his patients' rights of privacy. (*McKirdy* v. *Superior Court, supra,* 138 Cal.App.3d at pp. 18-19.) The appellate court found no conflict and explained that "[u]nder the privacy clause one who seeks, in behalf of the state or by invocation of state authority by judicial process or otherwise, to obtain information subject to individual privacy rights must be prepared to make a showing of predominant state need and sufficiently circumscribed means. It is absurd to suggest, as McKirdy necessarily does, that the special master procedure is the only sufficient vehicle for such a showing in this action and therefore that the statutory exception would—or could—'preclude' such a showing. If the privacy clause applies at all to the situation described in the record it applies notwithstanding the statutory exception." (*McKirdy* v. *Superior Court, supra,* 138 Cal.App.3d at p. 20.)

*McKirdy* determined that "the Fraud Unit's failure to obtain, in advance, a hearing on the privacy issues upon notice to all parties" did not violate the patients' privacy rights, and declared that "[i]n proceedings in which a state administrative agency is empowered to issue its own subpoenas it is enough that the state incorporate into the subpoena declaration a showing on the privacy issues sufficient to sustain the state's position upon subsequent judicial review. [Citation.]" (138 Cal.App.3d at p. 21.)

The *McKirdy* court then explained that a noticed hearing before disclosure of documents was not required because "the state's legitimate interest in obtaining full and accurate information would be unduly compromised, in such situations, by affording direct or indirect advance notice to an inculpated custodian who might be motivated to destroy, conceal, or otherwise alter the evidence. [Furthermore,] the search warrant procedure, designed for the very purpose of permitting neutral and detached, . . . , determination of the propriety of a proposed invasion of a reasonable expectation of privacy, provides a satisfactory means by which the state's showing may be made and determined in circumstances such as these." (138 Cal.App.3d at pp. 21-22.) The appellate court then concluded that ". . . the magistrate's decision to issue the warrant sufficiently implies a determination that the privacy rights

of McKirdy's patients should give way to the limited extent necessary to permit execution of the search warrant. [The] affidavit provides an adequate basis for that determination." (*Id.* at p. 22.)

In determining that the search warrant procedure properly weighed the patient's privacy interests, *McKirdy* considered the clear evidence of Medi-Cal fraud and the state's need to obtain access to patient's files to obtain specific evidence of the fraud. The records would contain information of the services performed and payments received. (138 Cal.App.3d at p. 22) *McKirdy* further noted that the fraud investigation sought only specific information and would require only a limited intrusion into the patient's medical information. (*Id.* at p. 23.) *McKirdy* concluded that ". . . the patients' privacy interests are plainly outweighed, in the circumstances before us, by the state's need to investigate and to prosecute a suspected fraud of which the patients themselves, as members of the public and as short-changed recipients of health care services, would be victims." (*Ibid.* at p. 23.)

*Reynaud* v. *Superior Court,* as previously discussed, was also a matter in which records were seized from a psychiatrist suspected of engaging in Medi-Cal fraud. In the appellate court, the psychiatrist argued against disclosure of his patient's records on grounds of both privilege and violation of privacy.

The privacy contentions and argument in *Reynaud* are similar to those in *McKirdy* and do not bear repeating. What is important to add, however, is that in finding there was no need for a required hearing before disclosure of the documents, the *Reynaud* court characterized the Medi-Cal records as state records. Therefore, "[i]n the circumstances of this action no reasonable occasion for an advance showing concerning, or determination of, patients' privacy rights arose. The Blue Shield records were essentially internal to the state and were based on information disclosed to the state for legitimate purposes. It would have been unreasonable to have required the state to make a formal showing . . . before reviewing its own records for the very purposes for which those records were compiled. We note with approval another court's conclusion that this kind of essentially internal agency investigation of possible fraud on the public 'is not the stuff out of which a cause of action for violation of right of privacy grows.' [Citation.]" (*Reynaud* v. *Superior Court, supra,* 138 Cal.App.3d at p. 9.)

■ Applying these legal authorities to our case, the record reflects Investigator Blair's search warrant affidavit provided the magistrate detailed information regarding Brillantes's involvement in a fraudulent billing scheme. Blair reviewed billing records Brillantes submitted to the state, and

concluded that the numbers did not agree with information investigators compiled from surveillances and discussions with Brilliantes's employees. It was necessary, according to Blair, to obtain the records of Brillantes's Medi-Cal patients to compare services provided with the bills Brillantes rendered to the state. The state was only interested in patient files of Medi-Cal beneficiaries, and executed the search warrant with a list of those names. The state was going to compare those files with billing records and look for patterns that might suggest false billing procedures. The state was not interested in the details of the treatment provided the Medi-Cal patients. The investigation focused instead on finding evidence of fraud. This information would be used to support the charges against Brillantes, and to protect Medi-Cal beneficiaries from being the victims of fraud in their own health care. The search warrant procedure used in this case adequately protected whatever privacy interest the patients had in their medical information.

The state has an interest in administering a fraud-free Medi-Cal program and assuring the beneficiaries proper medical treatment. The state also has an interest in Brillantes's records of the Medi-Cal patients that are material in determining if there was any unnecessary treatment or fraud in billing procedures. The medical records are a proper source of inquiry. They contain relevant information about dates of treatment, and about diagnosis, nature, and extent of treatment. These records are necessary for investigation of the validity of a claim, which has been submitted for payment and paid with public funds. The state has no other means to obtain this information.

The privacy interest the Medi-Cal patients maintain in their files is not absolute. It is determined, in part, by their involvement in a state-funded program that allows monitoring and auditing of patient medical records. These records can be used, by law, to investigate fraud in the administration of the Medi-Cal program. We can infer that by participating in this program, the patients knowingly relinquished a portion of their privacy interest in exchange for state-funded medical services.

Under the facts of this case, we weigh the Medi-Cal patients' privacy rights against the state's legitimate interest in investigating and prosecuting Medi-Cal fraud, and find the state has demonstrated a compelling interest in the medical records related to the Medi-Cal fraud investigation. Whatever interest the patients maintain in their files must yield to the compelling interest of the state.

■ "However, determination of the nature of the compelling state interest does not complete the constitutional equation. [Citation.] An impairment of the privacy interest 'passes constitutional muster only if it is

*necessary* to achieve the compelling interest.' [Citation.] 'That means that the conflict between the competing values must be unavoidable, i.e., that it does not arise from the choice of means by which to secure the compelling interest. It can readily be seen that if the conflict is avoidable but is not avoided the real conflict is not between the compelling interest and the constitutional interest but between the *means* chosen to achieve the compelling interest and the constitutional interest. Thus, a logical corollary of the compelling interest doctrine is the alternatives test. It requires a reordering of the values to be placed on the constitutional scales. If an alternative means of securing the compelling interest can be devised by which to avoid or minimize the conflict between the values protected by the constitution and the values found to be of compelling interest, that must be done. [Citation.] This results in a prohibition, among other things, of overbroad means of enforcement. It requires that the state utilize the "least intrusive" means to satisfy its interest. [Citation.]' [Citations.]" (*Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 934.)

■ The state has no cognizable interest in patient files unrelated to the Medi-Cal fraud investigation, nor should it. Procedures must be utilized that would identify, remove, and return to Brillantes the files of private patients and documents immaterial to the investigation. "The scope of methods used must be tailored to avoid disclosure of protected records." (*Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 934.)

We conclude that the Medi-Cal patient files specifically related to the fraud investigation must be unsealed and provided to the investigators. The files need not be reviewed in camera. The trial court's protective order, which Brilliantes never complained was inadequate, should be put into effect to provide the Medi-Cal beneficiaries further protection. This method should accommodate "the competing considerations of confidentiality and disclosure." (*Palay* v. *Superior Court, supra,* 18 Cal.App.4th at p. 935.) The trial court can then determine if further protective orders, or other methods to control the dissemination of confidential material, would be appropriate in this case.

The trial court did not abuse its discretion in determining the inapplicability of the physician-patient privilege and the limited privacy interests of the Medi-Cal beneficiaries, and in denying Brillantes's motion for a sealing order.

### DISPOSITION

The petition for writ of mandate is denied, and the alternate writ is discharged. The stay imposed by this court shall remain in effect until

issuance of the remittitur. The real party in interest is to recover costs on appeal.

Klein, P. J., and Croskey, J., concurred.

Petitioner's application for review by the Supreme Court was denied March 12, 1997.