### STATE

v.

### Salvatore GUIDO.

No. 96–328–C.A.

Supreme Court of Rhode Island.

July 31, 1997.

lief.

Lauren Sandler Zurier, Aaron L. Weisman, Providence, for plaintiff.

Kelly M. Fracassa, Louis B. Cappuccio, Jr., Westerly, for defendant.

Before WEISBERGER, C.J., LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

BOURCIER, Justice.

The defendant, Salvatore Guido, appeals to this Court following his conviction by a Washington County Superior Court jury on one count of driving under the influence with serious bodily injury resulting, in violation of G.L.1956 § 31–27–2.6. Subsequent to his conviction the defendant had moved for a new trial alleging that the trial justice had improperly admitted hospital medical records that revealed his post-collision blood-alcohol level. His motion was denied, and he was sentenced to a term of ten years, with six years of that term to be served and with the remaining four years of the sentence suspended. He was also fined $2,500 and ordered to make restitution to the victim. His driver's license was revoked for two years. On appeal the defendant contends that the trial justice erred in denying his motion for a new trial. He asserts that the admission of the hospital medical records was in violation of his doctor/patient privilege, that the records were obtained without a warrant in violation of his Fourth Amendment rights, and finally that the records were obtained through a misuse of the statewide grand jury. We agree with the trial justice that the medical record evidence was properly admitted. We affirm the judgment of conviction

and the trial justice's denial of the defendant's new trial motion.

## I

### Case Facts and Travel

On May 15, 1993 at approximately 10:30 p.m., defendant and a sixteen-year-old girl named Sarah Anderson (Anderson) were each driving motor vehicles on Airport Road in the town of Westerly when they were involved in a head-on collision. Both defendant and Anderson were severely injured. Anderson was trapped inside her vehicle for over an hour until rescuers were able to extricate her using the "jaws of life." After being removed from the wreckage, she was taken to Rhode Island Hospital by an emergency medical helicopter. She was there treated for numerous injuries including broken ribs, bruised lungs, a dislocated hip and a fractured ankle and wrist. The defendant also sustained numerous and serious injuries. According to law enforcement personnel he was found unconscious, slumped across the front seat of his vehicle. Both of his legs were fractured, and he was bleeding profusely. Like Anderson, he was taken by medical helicopter to Rhode Island Hospital. His condition was diagnosed as critical.

During emergency-room treatment, pursuant to hospital protocol, a blood sample was drawn from the defendant and tested for the presence of alcohol. The blood tests performed indicated that alcohol was present in defendant's blood sample in the amount of 0.203 percent—twice the legal limit permitted in Rhode Island pursuant to § 31–27–2(b)(1). Experts would later opine that defendant's body blood-alcohol level was probably higher at the time of the collision in view of the fact that much of defendant's blood-volume had been replaced by intravenous fluids while he was en route to the hospital.

The cause of the accident was initially unknown to police. When authorities arrived at the scene, they found Anderson, hysterical and pinned inside her car. She told police that she might have been at fault and crossed the yellow line into defendant's lane of traffic. Other evidence, however, pointed to defendant. It was discovered that he had been traveling home from a bachelor party held at the Moose Club in Westerly where he had been seen drinking. One of the rescue personnel found an open, partially filled bottle of beer on the front floor of defendant's car. Another rescue member noticed a slight odor of alcohol emanating from defendant.

Three days later on May 18, 1993, Sergeant Larry Gwaltney (Gwaltney) of the Westerly police department appeared before the statewide grand jury sitting in Kent County and requested subpoenas duces tecum to obtain Rhode Island Hospital's medical records relating to the blood-alcohol levels of both defendant and Anderson. Gwaltney explained to the grand jury that he was investigating a serious motor vehicle accident and needed the medical records to assist in the investigation. He additionally requested to be made an agent of the grand jury for return of service on the subpoenas. The grand jury granted both requests. The subpoenas did not compel the keeper of the hospital records to appear before the grand jury and contained no return date for compliance but instead authorized Gwaltney to receive the records.

Gwaltney subsequently made service of the grand jury subpoenas at Rhode Island Hospital and obtained the medical records, including those pertaining to defendant's blood-alcohol level. The hospital raised no objection to the subpoenas. The defendant's consent to the release of his medical records was never obtained.

Upon receiving the medical records, Gwaltney, rather than return them to the grand jury, instead turned them over to the Office of the Attorney General. The Attorney General later utilized the records to conclude probable cause for the filing of a criminal information in June of 1993 in which the defendant was charged, pre-empting the return of any indictment by the grand jury that had issued the subpoenas.

Prior to trial, defendant filed several motions to suppress the hospital records. He contended that his Fourth Amendment rights had been violated because the hospital record blood-alcohol evidence obtained by the grand jury's subpoenas was privileged medical information and that the grand jury had been

misused by the Office of the Attorney General. He additionally moved to dismiss the case for lack of probable cause. The trial justice denied each of defendant's motions. Thereafter, he was tried before a jury.

At that trial, the opinion testimony from two accident reconstruction experts was contradictory. The state's accident reconstruction expert, Joseph Cosentino, of the Westerly police department, opined, relying upon his firsthand observations of the evidence at the scene of the collision, that the point of impact occurred on Anderson's side of the roadway. The defendant's expert, on the other hand, Yau Wu, Ph.D., concluded that the impact occurred on defendant's side of the road. His opinion, however, unlike the state's expert, was not based upon firsthand observation of the evidence. The defendant was found guilty and convicted. His appeal was timely filed and he was released on bail pending his appeal.

## II

## Analysis

### A. The Search

The defendant first contends that when Gwaltney obtained the medical records from Rhode Island Hospital he, in essence, had conducted what amounted to a Fourth Amendment search and was therefore required to obtain a warrant for that search based upon probable cause. In rejecting that contention, the trial justice concluded that the constitutional protection against unreasonable searches and seizures was not implicated because there was no state action involved. Relying on *State v. Lussier*, 511 A.2d 958 (R.I.1986), she decided that the blood tests were performed as a result of hospital protocol rather than at the command of law enforcement and that no state action took place. We agree, but believe that state action was invoked when the grand jury authorized the subpoena for the medical records. However, no Fourth Amendment protections were triggered.

▬ The Fourth Amendment exclusionary rule is "based upon the deterrence of illegal police or prosecutorial actions, [and] it is not triggered by the actions of private persons however egregious they may be." *State v. Pailon*, 590 A.2d 858, 861 (R.I.1991). In the instant case the sample of blood withdrawn from defendant at Rhode Island Hospital was taken by hospital personnel. They acted according to recognized hospital practice designed to assist hospital personnel in electing medical prescription and treatment rather than at the direction of state authorities. For this reason there was no state action involved when the blood was withdrawn and the private hospital's activity triggered no Fourth Amendment concern. *Compare State v. Collins*, 679 A.2d 862 (R.I.1996); (blood withdrawn by medical personnel for their own use); *State v. Lussier*, 511 A.2d 958 (R.I.1986) (blood withdrawn for use of medical personnel), *with State v. Timms*, 505 A.2d 1132 (R.I.1986) (blood withdrawn at direction of police for state use).

▬ The defendant maintains, however, that when Gwaltney subsequently executed the subpoena for the medical records, he did so as the result of state action and invoked the Fourth Amendment. We acknowledge the distinction he draws between the initial private activity in withdrawing the blood and the subsequent grand-jury subpoenas compelling the production of the hospital records. A grand jury subpoena is not purely private action. However, we nonetheless reject the contention that the Fourth Amendment was implicated here. Putting aside the fact that grand juries are less cabined by Fourth Amendment restrictions, *see United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara*, 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973), we are of the opinion that defendant had no legitimate Fourth Amendment expectation of privacy in Rhode Island Hospital's medical records relating to his emergency treatment following his near fatal automobile collision.

▬ The Fourth Amendment protects against state intrusions into legitimate expectations of privacy. *See State v. Bjerke*, 697 A.2d 1069 (R.I., 1997); *State v. Bertram*, 591 A.2d 14 (R.I.1991). The expectation must be one actually held by the defendant and one that society at large would recognize as reasonable. *See Bjerke*, op. at 18; *Bertram*, 591

A.2d at 19. "[W]hen no reasonable privacy interest has been unlawfully invaded, the introduction of evidence seized is not prevented." *Timms,* 505 A.2d at 1137. In this case we conclude that defendant had no legitimate expectation of privacy in the medical records. We reach this conclusion largely on the basis that these records were produced by medical personnel for *their* use in providing medical treatment. These were not defendant's personal papers created or kept by him. The defendant can demonstrate neither ownership nor possession. For those reasons the records here more closely resemble the telephone records lawfully subpoenaed in *State v. McGoff,* 517 A.2d 232 (R.I.1986), or the bank records subpoenaed in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).

### B. The Privilege

■ Even if his medical records were not protected by the Fourth Amendment, defendant nevertheless asserts that these documents were privileged pursuant to the Confidentiality of Health Care Information Act, G.L.1956 § 5–37.3–4.[1] He suggests that this statute entitled his medical records to protection from invasion of privacy by the law enforcement or grand jury process. We initially point out that at common law no physician-patient privilege was recognized in Rhode Island. *See Lewis v. Roderick,* 617 A.2d 119 (R.I.1992); *In re Grand Jury Investigation,* 441 A.2d 525 (R.I.1982); *Banigan v. Banigan,* 26 R.I. 454, 59 A. 313 (1904). The act, however, represents a statutory creation of a form of that privilege. As we explained when initially confronting its language, "Section 5–37.3–4(a) provides that subject to certain exceptions enumerated in § 5–37.3–4(b), a patient's confidential health-care information shall not be released without the patient's written consent." *Bartlett v. Danti,* 503 A.2d 515, 517 (R.I.1986). We nevertheless reject defendant's contention that the material here was privileged.

We are of the opinion that § 5–37.3–4 could not constitutionally prohibit judicial access to these types of records. In *Bartlett* this Court responded to a series of certified questions from the Superior Court regarding the constitutionality of § 5–37.3–6, a sister provision of the section now before us. At that time we stated:

"We find § 5–37.3–6 to be violative of the separation of powers mandated by article 3 of the Rhode Island Constitution. Section 5–37.3–6, in addition to interfering with the subpoena power of the judiciary, removes from the court's discretion the determination of admissibility of otherwise relevant evidence. *Read in conjunction with § 5–37.3–4(a),* the statute vests the power to make such determinations in the hands of individual patients who can decide with impunity whether to permit access to such information." *Bartlett,* 503 A.2d at 517 (Emphasis added.).

The constitutional defect that we found so troublesome in 5–37.3–6 we also recognized as lurking in § 5–37.3–4(a). In this case the constitutional defect in § 5–37.3–4(a) would permit defendant to hide evidence of his intoxication from legal process subject only to his whim. The defendant's contention, if accepted, would constitute a serious impediment to the Judiciary's ability to carry out its function in a large variety of criminal cases. *See In re Grand Jury Investigation,* 441 A.2d 525 (R.I.1982). We therefore reject it.

### C. The Grand Jury

The defendant finally asserts here in his appeal that the Department of the Attorney General abused the grand jury system. He contends that when Gwaltney, acting as the agent of the grand jury, turned over the defendant's hospital records to the Office of the Attorney General, the secrecy of the grand jury process was compromised. Additionally he maintains that the Attorney General's use of those subpoenaed records in preparing and filing the criminal information

---

1. The State asserts that in the lower court the defendant's privilege objection was based solely on G.L.1956 § 9–17–24 and therefore that his objection now before this Court on the basis of § 5–37.3–4 has been waived. Section 9–17–24 was declared unconstitutional. *See State v. Al-* *monte,* 644 A.2d 295 (R.I.1994). We believe that the substance of defendant's argument remains the same and therefore will consider his objection despite his reliance below on a different statutory provision.

against him without further involvement of the grand jury was an unlawful usurpation of the grand jury power in order to circumvent the protections afforded him by the Confidentiality of the Health Care Information Act and our State and Federal Constitutions. Before analyzing defendant's claim, we think it advisable to place the role of the grand jury in proper perspective.

Article 1, section 7 of the Rhode Island Constitution provides in pertinent part:

"[N]o person shall be held to answer for any other felony unless on presentment or indictment by a grand jury or on information in writing signed by the attorney-general or one of the attorney-general's designated assistants, as the general assembly may provide and in accordance with procedures enacted by the general assembly."

Unlike the federal system, the criminal charging process so created by that constitutional provision permits a defendant to be charged by either grand jury indictment or by information filed by the Attorney General or his designated assistants.

We have long recognized that the powers of our state grand juries are those that were to be found at common law. *In re Buxton,* 111 R.I. 480, 482, 304 A.2d 350, 351–52 (1973); *Opinion to the Governor,* 62 R.I. 200, 4 A.2d 487 (1939). In an advisory opinion to the governor, we explained:

"From the history of the grand jury, only briefly outlined here, in England and Rhode Island up to the time of the adoption of our constitution, and from a consideration of the language of sec. 7, we draw the natural and, as we think, the necessary conclusion that the framers of our constitution, by writing that section into the bill of rights, intended to secure thereby to every person who might be accused of a serious crime the same protection as had been provided by the common law * * *." *Opinion to the Governor,* 62 R.I. at 205, 4 A.2d 487.

Following its common law heritage our grand juries act in the "interrelated but distinct functions" of investigating and indicting. 1 Sara Beale and William Bryson, *Grand Jury Law and Practice,* § 1:07 at 35 (1986).

In its indicting capacity, the grand jury is said to act as a shield, examining evidence to see whether there is "sufficient evidentiary support to justify holding the accused for trial on each charge" and thereby protecting the public from baseless prosecutorial accusations. *Id.* In its investigating capacity the grand jury is said to act as a sword, ferreting out criminal conduct. *Id.*

 The investigating authority of the grand jury, the role with which we are concerned today, is broad. *See In re Grand Jury Investigation,* 441 A.2d at 531; *Buxton,* 111 R.I. at 482, 304 A.2d at 352. In discussing the breadth of this authority, the United States Supreme Court has stated:

"Because [the grand jury's] task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. 'It is a grand inquest, a body with power of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.'" *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626, 643 (1972).

For this reason "[t]he grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561, 568–69 (1974). Thus a witness " 'is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise.' " *Id.* at 345, 94 S.Ct. at 619, 38 L.Ed.2d at 570.

 Of course the powers of the grand jury are not entirely unrestrained. They remain subject to judicial control. *Buxton,* 111 R.I. at 482, 304 A.2d at 352. "It may consider incompetent evidence, but it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law." *Calandra,* 414 U.S. at

346, 94 S.Ct. at 619, 38 L.Ed.2d at 570. Thus the United States Supreme Court has established that whereas a grand-jury indictment based upon evidence obtained in violation of one's Fifth Amendment privilege is valid, the grand jury "may not force a witness to answer questions in violation of that constitutional guarantee[,]" unless it grants immunity. *Id.* Likewise although the Fourth Amendment exclusionary rule has not been extended to grand jury proceedings, a "grand jury is also without power to invade a legitimate privacy interest protected by the Fourth Amendment." *Id.* Finally, a grand jury subpoena might be quashed by a court " 'if compliance would be unreasonable or oppressive.' " *United States v. R. Enterprises, Inc.,* 498 U.S. 292, 299, 111 S.Ct. 722, 727, 112 L.Ed.2d 795, 806 (1991).

■■■■ We acknowledge that in carrying out its unique investigative function, grand jury inquiries are often carried out with great assistance from and with interaction with the Office of the Attorney General and its police investigators. *See, e.g., In re Grand Jury Investigation,* 441 A.2d 525 (R.I. 1982). This certainly has been recognized law in this state as well as at the federal level. "[I]t is equally well established that the Attorney General may, and in fact it is his duty to, attend on the grand jurors with matters on which they are to pass, aid in the examination of witnesses, and give such general instructions as they may require." *State v. Edwards,* 153 A.2d 153, 158–59, 89 R.I. 378, 386–87 (1959); *see also United States v. Sells Engineering, Inc.,* 463 U.S. 418, 428, 103 S.Ct. 3133, 3141, 77 L.Ed.2d 743, 755 (1983). As the Court of Appeals for the First Circuit explained, "To be sure, the powers of the United States Attorney in connection with a grand jury investigation are substantial. He may, in practice, select the witnesses to be subpoenaed to appear before the grand jury and generally direct the investigation." *In re Melvin,* 546 F.2d 1, 5 (1st Cir.1976). We continue to recognize the validity of this relationship between the Office of the Attorney General and our state grand juries. For this reason we reject defendant's contention that the secrecy of the grand jury proceeding was violated in this instance when the medical records subpoe-

naed by the grand jury were later turned over to the Office of the Attorney General. We do not find it at all irregular that the Attorney General's office may in many instances examine evidence subpoenaed by the grand jury.

■■■■ Recognizing the strength of this position, the State suggests that all that is being asserted here by the defendant is an attack upon the broad investigative power of the grand jury. The state asserts that grand jury subpoenas are presumed regular and may only be challenged for their unreasonableness or their oppressiveness and that neither is present here. *See United States v. R. Enterprises, Inc.,* 498 U.S. 292, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991). We find merit in that legal proposition and conclusion. We also discern, however, that the claim of error asserted here is not quite so easily extinguished.

■■■■ Even though an intimate relationship among the Office of the Attorney General, its investigators, and grand juries does exist, this is not to say that their powers are coextensive. Neither prosecuting attorneys nor police have been granted the broad investigative powers of grand juries. They are not immune from the Fourth Amendment exclusionary rule and are subject to the many evidentiary rules that a grand jury may ignore with impunity. This is true in part because of the historically different and at times antagonistic roles of prosecutors and grand juries.

That analysis being true, it follows that a point may be reached at which the relationship between the prosecuting attorney and the grand jury may well become so intertwined that it may be said that the prosecuting attorney has improperly usurped the power of the grand jury. This, we believe, more accurately describes the contention defendant lays before this Court. The response thereto has dramatic consequences in terms of personal liberties and requires elaboration, for as we have acknowledged, the investigative power of the grand jury is nearly untrammeled while the power of the Attorney General remains cabined. A complete delegation of the grand jury's subpoena pow-

er to the Office of the Attorney General would have a significant impact on the guarantees afforded by the Fourth, the Fifth, and the Sixth Amendments to the United States Constitution as well as to our Rhode Island Constitution and would have a historical consequence that "cannot be accepted if the grand jury's own role is to remain at all meaningful." *Melvin*, 546 F.2d at 5. Case law supports this view.

Thus in *In re Melvin* the First Circuit Court of Appeals stated unequivocally that a United States Attorney lacked authority to issue a subpoena to gather evidence purportedly at the grand jury's request where there was no participation by the grand jury. The Court stated:

"An order to appear in a lineup, addressed to someone as to whom probable cause to arrest has not yet been found, and requiring attendance outside the grand jury room at a proceeding not under the grand jury's immediate supervision, goes considerably beyond the routine issuance of subpoenas and other actions in which the United States Attorney has proceeded without specific direction of the grand jury." *Melvin*, 546 F.2d at 5.

That language makes it clear that a potential for danger exists whenever the grand jury's role is usurped or the grand jury is used to expand the investigating authority of the prosecuting attorney and police to circumvent constitutional and procedural safeguards.

In *People v. Vesely*, 41 Colo.App. 325, 587 P.2d 802 (1978), a Colorado district attorney obtained a defendant's bank statements and signature card by way of a grand jury subpoena. The subpoena was never returned to the grand jury, and there was no evidence that the grand jury was in fact truly investigating the defendant. The defendant was never indicted but was ultimately charged, as here, by way of a criminal information. *Id.*, 587 P.2d at 804. The defendant asserted that the grand jury had been used merely to "short-circuit" the criminal discovery process. *Id.* Although concluding that the state's conduct did not rise to the level of reversible error, the Colorado court nonetheless acknowledged, as does our First Circuit

Court of Appeals, the potential constitutional and historical impropriety of such conduct. *Id.; see also People v. Corr*, 682 P.2d 20 (Colo.1984) (suppressing evidence obtained under improper grand jury subpoenas). Leading commentators have also noted the potential impropriety, stating:

"The subpoena power of the grand jury is designed for its own use, not to further independent investigations of the prosecutor or police. In most jurisdictions, the prosecutor may have subpoenas issued without advance authorization of the grand jury, but the purpose of the subpoena must be to produce evidence for use by the grand jury." 1 Wayne LaFave & Jerold Israel, *Criminal Procedure*, § 8.8(e) at 665 (1984).

Returning to the case facts before us, the evidence demonstrates that a validly convened grand jury had authorized Gwaltney to be its agent and had directed him to receive the hospital medical records relating to defendant's blood-alcohol level. The subpoena was duly served upon the hospital, and it responded thereto by delivering the required medical record to Gwaltney. He in turn delivered those records to the Attorney General's office, presumably to the assistant attorney general assigned to assist the grand jury in its function. Those medical records, we further assume, were examined by the Attorney General's grand-jury representative to determine whether the hospital had properly complied with the request for medical records contained in the subpoena. The information from that review was admittedly used in part to establish the probable cause supporting the charge made against defendant by way of a criminal information. Although the medical records were not directly turned over to the grand jury, we discern from the record before us no reversible error in that regard. Although suspicious, this is not an instance wherein the role of the grand jury was entirely usurped as in *Melvin*. The historical role of the grand jury as the repository of the authority to compel and control the ultimate direction of a criminal investigation was not entirely undermined. Although clearly only peripherally involved, the grand jury did authorize the subpoena here. Thus

**738**

its role, while bent, was not, as in *Melvin,* broken.[2] In the absence of a serious impairment to the integrity of the grand jury process, we are reluctant to conclude that reversible error exists here.

We are additionally reluctant to conclude reversible error because we are of the opinion that the Office of the Attorney General could, and in fact did, later obtain the relevant medical records containing the defendant's blood-alcohol level report by way of a Rule 17(c) subpoena that was issued upon probable cause, after proper application to the Superior Court and after due notice had been given to defense counsel. The hospital records introduced into evidence at the de-

fendant's jury trial were those obtained pursuant to the valid Rule 17(c) subpoena.

For the foregoing reasons the defendant's appeal is hereby denied and dismissed, and the judgment appealed from is affirmed. The papers are remanded to the Superior Court.

GOLDBERG, J., did not participate.

---

**2.** If, however, the record revealed that the Attorney General's Office or its police investigators had deliberately utilized the grand jury subpoena process merely as a subterfuge for obtaining defendant's medical records for the sole purpose of garnering sufficient evidence to support charging him by means of an information rather than an indictment, such subterfuge might represent a "serious impairment" to the grand jury process and could constitute reversible prosecutorial error. *See Commonwealth v. Cote,* 407 Mass. 827, 556 N.E.2d 45, 49 (1990). "A district attorney should limit use of grand jury subpoenas to situations which further the grand jury's function." *Id.; see also Durbin v. United States,* 221 F.2d 520 (D.C.Cir.1954); *United States v. O'Kane,* 439 F.Supp. 211 (S.D.Fla.1977).